841 A.2d 816

**OAK CREST VILLAGE, INC.**

v.

**Sherwood R. MURPHY.**

**No. 27, Sept. Term, 2003.**

Court of Appeals of Maryland.

Feb. 9, 2004.

---

Howard L. Sollins (John M.G. Murphy and Jesse B. Hammock of Ober, Kaler, Grimes & Shriver of Baltimore), on brief, for appellant.

Norman L. Smith (Fisher & Winner, LLP of Baltimore, Jason A. Frank of Law Office of Jason A. Frank, Lutherville), on brief for appellee.

Ron M. Landsman, Bethesda, Brief Amici Curiae of the Maryland Continuing Care Residents Association and the

Maryland-D.C. Chapter, National Academy of Elder Law Attorneys.

Philip Moffat, King & Spalding, Washington, DC, Brief Amicus Curiae of American Association of Homes and Service for the Aging in Support of appellant.

Rochelle Bobroff, Stuart R. Cohen, AARP Foundation Litigation, Michael Schuster, Washington, DC, Brief of Amicus Curiae of AARP in Support of appellee.

J. Joseph Curran, Jr., Attorney General of Maryland, Jeffrey H. Myers, Debra J. Tervala, Assistant Attorneys General, Baltimore, Brief Amicus Curiae of Maryland Department of Aging.

Argued before BELL, C.J., ELDRIDGE *, RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

WILNER, Judge.

In November, 2001, Ruth and Sherwood Murphy moved into Oak Crest Village, a continuing care retirement community (CCRC) in Baltimore County. Ruth, then 81, moved to an independent living apartment. Sherwood, then 94, was admitted directly into a comprehensive care facility (nursing facility), which Oak Crest called Renaissance Gardens. As a condition to their acceptance into the CCRC, the Murphys were required to sign Residence and Care Agreements.[1] Section 8.11 of those agreements contained a covenant that, unless they had the prior written consent of Oak Crest, Ruth and Sherwood would not divest themselves of, or sell or transfer, any of their assets or property interests if the sale or transfer would result in their respective net worth falling

---

* Eldridge, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

1. Sherwood did not actually sign his agreement. It was signed by Ruth on his behalf.

below the minimum necessary to become an Oak Crest resident.

The issue before us is whether that covenant, as applied to Sherwood, contravenes Maryland Code, § 19.345(b) of the Health General (HG) Article and implementing regulations of the Department of Health and Mental Hygiene applicable to the Medicaid program and, for that reason, is unenforceable, at least while he remains a resident in the nursing facility. The Circuit Court for Baltimore County, in response to Oak Crest's action for breach of contract, fraudulent inducement, and fraudulent transfer, held the covenant invalid, and we shall affirm that judgment.

## BACKGROUND

CCRC's provide elderly persons with a continuum of housing and health care so that they may "age in place," without having to move away from a familiar setting when medical problems arise. In order to provide those services, CCRC's normally require from prospective residents either an advance transfer of a significant part of their assets or a substantial entrance fee and a commitment to pay further periodic charges.[2] Oak Crest uses the latter approach. CCRC's in Maryland are subject to the requirements of Maryland Code, Art. 70B, and to regulation thereunder by the State Department of Aging. If, as Oak Crest does, the CCRC chooses to participate in the Medicaid program, it is also subject to the statutes and regulations governing that program.

Consistent with the general purpose of CCRC's, Oak Crest operates three distinct, but integrated, levels of housing and health care: approximately 1,500 low-rise apartment units,

---

2. Maryland Code, Art. 70B, § 7(d), which is part of the law regulating CCRC's and continuing care contracts, defines "continuing care" as "furnishing or making available shelter and either medical and nursing services or other health related services to an individual 60 years of age or older not related by blood or marriage to the provider for the life of the individual or for a period in excess of 1 year under one or more written agreements that require a transfer of assets or an entrance fee notwithstanding periodic charges."

where residents may live largely independent lives; 129 assisted living units, in which residents receive greater attention to their health care needs; and a 288–bed nursing home, Renaissance Gardens, in which residents receive continuous nursing care.[3] Renaissance Gardens constitutes a Medicaid certified skilled nursing "facility," as that term is defined in Maryland Code, HG § 19–343(a). Residents may move from one level of care to another, as circumstances require and availability allows. That, indeed, is one of the hallmarks of a CCRC.

Oak Crest has a formal, structured application process. In order to reserve space, prospective residents must (1) complete an application and deposit agreement, and, in furtherance of that application, provide detailed financial information to assure their ability to pay the residential fees, and (2) submit to a "Pre–Residency Health Evaluation and Interview," to determine the level of care that will be needed. If accepted, the applicants then sign a Residence and Care Agreement.

For some period of time before his admission to Renaissance Gardens, Sherwood Murphy suffered from a subdural hematoma—an accumulation of blood in the space between the dural and arachnoidal membranes (the outer and middle coverings) of the brain—which had rendered him incompetent to handle his affairs. Although it does not appear that he was ever declared legally disabled or that a guardian had ever been appointed for him, Ruth acted as his attorney-in-fact. He had been a patient at a facility known as Genesis Elder Care in Severna Park since August, 1999. The record does not reveal the nature of that facility. In April, 2000, Ruth sold the family home, deposited the proceeds of $178,000 in a bank account owned jointly by Ruth and her daughter, Mildred, and began living at an independent living community in Severna Park known as Sunrise.

---

**3.** In its *amicus* brief, the Department of Aging points out that CCRC's also commonly provide communal dining facilities and other amenities, such as libraries, pools, and gardens. We shall assume that Oak Crest provides those services and facilities as well, although the record does not reveal it.

In June, 2001, the Murphys, through Ruth, filed a residency application with Oak Crest.  In furtherance of the application, they supplied detailed financial and health information.  The health information is not in the record.  The financial information reveals that the couple had about $450,000 in jointly owned assets, Sherwood had $19,000 in personal savings in his own name, Ruth had $126,000 in personal savings in her own name, and Ruth had an additional $68,000 in savings held jointly with her daughter.  The Executive Director at Oak Crest reviewed the information, concluded that the Murphys had sufficient assets to pay the requisite fees based on actuarial projections of their life expectancy, and accepted the application.

Ruth signed two separate Residence and Care Agreements, one for her and one, along with an addendum, on behalf of Sherwood.  Only Sherwood's agreement is in the record. That agreement, dated November 26, 2001, "governs residency at Oak Crest" and professes to "detail[ ] the services provided in each level of care and the limited circumstances for transfer to another level of care."  Section 3.01 gives Sherwood the right to occupy room RENS–N132 in the continuing care unit, subject to various provisions governing transfers to other units or termination of the agreement.  The agreement recites that Sherwood had paid a deposit fee of $150 and requires that he pay an entrance deposit of $78,000 and living unit fees, which, for the room in the continuing care unit, was set at $192/day ($1,344/week, $69,888/year), subject to annual revision.[4]  Section 8.11 of the agreement stated that the financial information submitted by or on behalf of Sherwood was a material aspect upon which Oak Crest relied in determining his qualifications for becoming an Oak Crest resident.  It continued that Oak Crest was committed to

---

**4.**  By affidavit, Ruth averred that she had made the deposit of $78,000 with respect to her agreement and that Sherwood had made a deposit of $133,000.  The discrepancy is unimportant.  She claimed that, in addition to the $192/day for Sherwood's room at the nursing facility, she was obligated to pay $1,075/month for her independent living apartment.

assisting a resident who has depleted his assets through normal living expenses so that he may continue to remain at Oak Crest, but that,

"[t]o protect Oak Crest from a situation wherein a Resident divests him/herself of those assets for the purpose of qualifying for assistance or reduction of Monthly Fees, Resident agrees not to divest him/herself of, sell, or transfer any assets or property interests (excluding expenditures for Resident's normal living expenses) that would result in a reduction in Resident's net worth (assets less liabilities) which is below the minimum criteria to become a Oak Crest resident, without having first obtained the written consent of Oak Crest."

Section 8.11 made reference to § 6.04 h., dealing with financial inability to pay. That section stated that it was not Oak Crest's policy to terminate a resident's occupancy because of financial inability to pay, provided that the resident was "otherwise in compliance with the terms of this Agreement," and that Oak Crest would endeavor to assist such residents by reducing monthly fees to an appropriate level or by providing other assistance. The section required, however, that a resident unable to make the full monthly payments take one or more of certain enumerated actions, as directed by Oak Crest's Executive Director. The first was to make every reasonable effort to obtain assistance from family or other available means. The second, if the resident qualified, was to take necessary steps to obtain "county, state, and federal aid or assistance, excluding Medicaid, but including Medicare, public assistance and any other public benefit program." Procedurally, the resident would be required to file a statement with the Executive Director acknowledging, among other things, that the resident, from the date of application, "has not sold or transferred and will not sell or otherwise transfer any property in violation of the terms of this Agreement (see Section 8.11)."

The addendum stated that it was "anticipated" that Sherwood's care would be paid for by "your own income, funds, and/or assets," and it included a section dealing with "Private

Pay Residents." That section stated that Ruth would be responsible for paying for items and services provided to Sherwood during any period of time that Sherwood was a resident of the facility and not determined eligible for medical assistance. In the event Ruth did not pay what was owed, it required her to seek from Medicaid a determination of Sherwood's income and assets available to pay the cost of his care and to use those assets and income to pay for his care. If Sherwood should have insufficient income or assets to meet his financial obligations, Ruth agreed to apply for Medicaid benefits and to cooperate fully in the eligibility determination process. Indeed, the addendum warned Ruth that she faced a $10,000 civil penalty if she willfully or with gross negligence failed to seek Medicaid assistance on behalf of Sherwood or failed to cooperate fully in the Medicaid eligibility determination process.

The addendum also contained a section dealing with "Medicaid Residents," which noted that Oak Crest participates in the Medicaid program and provided that a resident was "not required to give up any of the Resident's rights to Medicaid benefits to be admitted or to stay at the Facility." It continued that if the resident's private funds were "used up" during his/her stay at the facility and the resident is eligible for Medicaid, "we will accept Medicaid payments." The addendum added that if the resident was eligible for Medicaid, "we may not charge, ask for, accept or receive any gift, money, donation or consideration other than Medicaid reimbursement as a condition of the Resident's admission or continued stay at the Facility." The term "Facility" was defined as "the nursing Facility."

The addendum to Sherwood's agreement was required to be signed by Ruth because it recited that she had access to and management or control of Sherwood's income, funds, or assets. Although the agreement made clear that Ruth was not required to use her own funds to pay the fees charged to Sherwood, it obligated her to pay those fees from Sherwood's funds.

Shortly after their move to the Oak Crest facilities, Ruth transferred over $356,000, which included the proceeds from the sale of the family home, savings that she and Sherwood owned jointly in the form of bank accounts, certificates of deposit, and brokerage accounts, and funds that she and her daughter owned jointly, into a consolidated bank account in her name and that of her daughter, as joint owners with the right of survivorship. In February, 2002, she used $250,000 from that account to purchase a seven-year fixed term annuity that provided for monthly payments to Ruth of $3,520. In May, 2002, she used $30,000 from the account to purchase an eight-year fixed term annuity that provided monthly payments of $353. Ruth withdrew the money and purchased the annuities as joint owner of the account and not as agent for Sherwood. The monthly payments are solely for the benefit of Ruth; Sherwood has no interest in them. At some point, Sherwood, being then bereft of substantial assets or income, applied for Medicaid benefits, and on July 24, 2002, effective June 1, 2002, he was found eligible. All private pay charges for Sherwood's care up to June 1, 2002, were paid in full.

When Oak Crest learned that Sherwood had been approved for Medicaid, it filed this lawsuit for declaratory and equitable relief, alleging a violation of § 8.11 of Sherwood's Residence and Care Agreement. Oak Crest sought to have the transfer of Sherwood's assets annulled and, alternatively, a declaration that, by virtue of the breach, Oak Crest had the right to rescind the executory aspects of the agreement, terminate Sherwood's membership at Oak Crest, and discharge him from the nursing facility. Sherwood responded with a motion to dismiss the complaint on a number of grounds, including assertions that the contract—presumably § 8.11—was unlawful under Federal and State law and void for that reason and that it also conflicted with provisions in the addendum that assured Oak Crest's participation in Medicaid.

The claim of illegality was based, in part, on (1) 42 U.S.C. § 1396r(c)(5)(A)(i), which prohibits a nursing facility from requiring written or oral assurance that applicants for residence are not eligible for and will not apply for Medicaid

benefits, (2) 42 U.S.C. § 1320a—7b(d)(2), which makes it a criminal offense for a person to charge, solicit, accept, or receive, any amount in excess of the consideration established in a State Medicaid plan as a precondition to admitting a patient to a nursing facility or as a requirement for the patient's continued stay in such a facility, (3) Maryland Code, HG § 19–345(b)(1), which is part of the Maryland Nursing Home Residents' Bill of Rights and precludes a Medicaid certified facility from including in an admission contract any requirement that, to stay at the facility, the resident "will be required to pay for any period of time or amount of money as a private pay resident for any period when the resident is eligible for Medicaid benefits," and (4) a regulation of the Department of Health and Mental Hygiene (COMAR 10.07.09.05B(4)) prohibiting a nursing facility from requiring residents or applicants to waive their rights to Medicaid.

The court treated the motion to dismiss as one for summary judgment (*see* Maryland Rule 2–322(c)) and, finding no genuine dispute of material fact, granted it. The court found § 8.11, upon which Oak Crest's action rested, to be in violation of the State statute and regulation and therefore void. It declined to reach the question of whether § 8.11 also contravened either of the Federal statutes. Oak Crest appealed, complaining that (1) HG § 19–345(b) does not apply to CCRC's and, for that reason, § 8.11 of the Agreement does not violate Maryland law, (2) the trial court failed to give appropriate deference to a determination by the State Department of Aging that the Agreement complies with applicable Maryland law, (3) Sherwood's continued residence at Oak Crest violates Oak Crest's exemption from the State requirement of a certificate of need, and (4) "Policy Issues" preclude Sherwood's interpretation of the law. We granted *certiorari* prior to proceedings in the Court of Special Appeals to consider those issues, and, as noted, shall affirm. As the Circuit Court restricted itself to the State law issue in entering the summary judgment, we shall do likewise.

■■■■■■■■■
■■■■■■■

## DISCUSSION

### Application of § 19–345

HG § 19–345 is part of a subset of statutes sometimes referred to as the Nursing Home Residents' Bill of Rights. Along with §§ 19–345.1 and 19–345.2, it places certain limits and conditions on the ability of nursing facilities to transfer or discharge patients without their consent. Section 19–345(a) prohibits a "facility" from transferring or discharging a resident except when (1) the transfer or discharge is necessary for the resident's welfare, (2) it is appropriate because the resident's health has improved sufficiently that the resident no longer needs the services provided by the facility, (3) the health or safety of an individual in the facility is endangered, (4) the resident has failed, after reasonable notice to pay for, or have Medicare or Medicaid pay for, a stay at the facility, or (5) the facility ceases to operate.

Section 19–345(b) applies to a "Medicaid certified facility." It precludes such a facility from including in a resident's admission contract "any requirement that, to stay at the facility, the resident will be required to pay for any period of time or amount of money as a private pay resident for any period when the resident is eligible for Medicaid benefits," and it also precludes the facility from transferring or discharging a resident involuntarily "because the resident is a Medicaid benefits recipient." Sherwood's argument, which found favor with the Circuit Court, is that, to the extent that § 8.11 of the Residence and Care Agreement precludes him from qualifying for Medicaid in order to discharge his obligations to Oak Crest and authorizes his discharge from Renaissance Gardens because he *has* qualified for Medicaid benefits, it is inconsistent with those statutory limitations.

Oak Crest's response to that argument is essentially that § 19–345(b) does not apply to CCRC's. In a three-line footnote in its initial brief, Oak Crest averred that the court's holding "was also error because the CCRC provision at issue does not require Mr. Murphy to pay at a private pay rate 'for any period when [Mr. Murphy] is eligible for Medicaid bene-

fits,' and thus does not violate Section 19–345." No further explanation is provided in that brief on the issue of whether, if § 19–345(b) *does* apply, there is a conflict between it and § 8.11. In a reply brief, Oak Crest addressed the issue further but added little to that unenlightening comment. It noted that, under § 8.11, CCRC residents are prohibited from making expenditures, other than normal living expenses, that would reduce their net worth below the minimum criteria for admission and posited simply that "[t]his provision does not violate Section 19–345's prohibition against requiring Medicaid nursing facility residents to pay privately for a period of time." It conceded that the requirement that residents use all of their assets not required for normal living expenses to pay the private pay rate ($192/day for Sherwood) "can affect the pace at which resident assets are diminished" but, claimed that "there is no requirement to maintain this pace for any predetermined period of time or at any prescribed rate."

Our initial response to this argument is that it is not properly before us. We have long and consistently held to the view that "if a point germane to the appeal is not adequately raised in a party's brief, the court may, and ordinarily should, decline to address it." *DiPino v. Davis*, 354 Md. 18, 56, 729 A.2d 354, 374 (1999); *Klauenberg v. State*, 355 Md. 528, 552, 735 A.2d 1061, 1073–74 (1999); *Moosavi v. State*, 355 Md. 651, 660–61, 736 A.2d 285, 290 (1999). *See also* Maryland Rule 8–504(a)(5). The three-line conclusory footnote in Oak Crest's brief does not adequately present the issue; it gives no reasons or no basis for challenging the Circuit Court's ruling that § 8.11 was substantively in conflict with HG § 19–345(b). Nor is it permissible to present that argument in a reply brief. In *Federal Land Bank v. Esham*, 43 Md.App. 446, 459, 406 A.2d 928, 936 (1979), the Court of Special Appeals correctly noted that, although reply briefs are permitted under the Rules of appellate procedure, their function is limited to responding to points and issues raised in the appellee's brief. An appellant is required to articulate and adequately argue all issues the appellant desires the appellate court to consider in the appellant's initial brief. It is impermissible to hold back

the main force of an argument to a reply brief and thereby diminish the opportunity of the appellee to respond to it. We have echoed similar sentiments. *See Fearnow v. C & P Telephone,* 342 Md. 363, 384, 676 A.2d 65, 75 (1996); *Warsame v. State,* 338 Md. 513, 517, n. 4, 659 A.2d 1271, 1273, n. 4 (1995).

We shall address the substantive conflict issue, notwithstanding Oak Crest's failure to properly present it, in part because of its public importance, but mostly because it does not appear that Sherwood was prejudiced. Presumably in response to the footnote in Oak Crest's initial brief, he did present argument on the point.

On its face, § 8.11 does not affirmatively impose a requirement that Sherwood pay at the private pay rate for any established period of time, even if he were to qualify for Medicaid benefits. The effect of the anti-alienation provision, however, when coupled with § 6.04h., is to preclude Sherwood from taking *lawful* steps to qualify for Medicaid benefits. Even should his resources become insufficient to pay his fees for reasons other than alienation, he is precluded from qualifying for Medicaid, absent Oak Crest's consent, without first seeking assistance from his family, and then seeking public assistance (other than Medicaid) from the county, State, and Federal governments—becoming a public charge. Section 8.11 thus effectively requires that he continue to pay at the private pay rate even when he would be or could lawfully become eligible for Medicaid benefits, contrary to HG § 19–345(b)(*l* )(i), and permits him to be discharged from a Medicaid certified nursing facility because he is a Medicaid recipient, contrary to § 19–345(b)(*l* )(ii).

The thrust of the argument properly presented by Oak Crest is that § 19–345(b) does not apply to CCRC's. Oak Crest urges that the statute applies only to nursing facilities and that Oak Crest, as a continuing care community, is not a nursing facility. For that reason, it says, § 19–345(b) does not apply to its agreement, which is a CCRC agreement and not a nursing facility agreement, and thus does not serve to invali-

date § 8.11 of its agreement. The short answer to this argument is that Renaissance Gardens—the facility into which Sherwood was admitted—*is* a Medicaid certified nursing facility to which the statute applies.

Title 19 of the Health–General Article deals with health care facilities. Subtitle 3 of that title deals with hospitals and "related institutions." With an exception not relevant here, HG § 19–301(*o*) defines a "related institution" as an "organized institution, environment, or home" that

"(i) Maintains conditions or facilities and equipment to provide domiciliary, personal, or nursing care for 2 or more unrelated individuals who are dependent on the administrator, operator, or proprietor for nursing care or the subsistence of daily living in a safe, sanitary, and healthful environment; and

(ii) Admits or retains the individuals for overnight care."

HG § 19–307(b) creates two classes of related institutions: a care home and a nursing home. A care home provides care to individuals who, because of advanced age or disability, require domiciliary or personal care in a protective environment. A related institution is regarded as a nursing home if it "(i) [p]rovides nursing care for chronically ill or convalescent patients; or (ii)[o]ffers to provide 24–hour a day nursing care of patients in a home-type facility such as . . . [a] nursing unit of a home for the aged . . ." Renaissance Gardens is clearly a nursing home under that definition.

Sections 19–342 through 19–352 provide certain individual rights for patients in hospitals and related institutions. Section 19–345, dealing with the transfer or discharge of patients, speaks in terms of residents of a "facility." That term, with respect to "related institutions," is defined in § 19–343 as a "related institution that, under the rules and regulations of the Department [of Health and Mental Hygiene], is a comprehensive care facility or an extended care facility." A "comprehensive care facility" is defined in COMAR 10.07.02.01(6) as "a facility which admits patients suffering from disease or disabilities or advanced age, requiring medical service and nursing

service rendered by or under the supervision of a registered nurse." Renaissance Gardens is a "comprehensive care facility" under that definition and thus a "facility" under HG § 19–345. Because Renaissance Gardens participates in the Medicaid program, it is also a "Medicaid certified facility" for purposes of § 19–345(b). *See* also COMAR 10.09.10.01(14), the definition section of regulations dealing with nursing facility services, which defines "facility" as "a facility licensed under COMAR 10.07.02 and certified as meeting the requirements of Title XIX of the Social Security Act, 42 U.S.C. § 1396 et seq., for participation as a nursing facility."

A CCRC, as noted, provides a range of accommodations and services and is not just a nursing facility. *See* Art. 70B, § 7(d), *supra*, defining "continuing care." CCRC's are subject to regulation by the Department of Aging under Art. 70B of the Maryland Code, and there is no provision in Art. 70B comparable to HG § 19–345(b). In seeking exclusion from § 19–345(b), Oak Crest stresses its status as a CCRC, urging that § 19–345(b) applies only to a stand-alone nursing facility, not a broad CCRC community that, as part of its overall service, includes a nursing facility.

Oak Crest raises an issue that is also of concern to the Department of Aging and that, in another context, might have more arguable validity. Because HG § 19–345(b) applies only to a "Medicaid certified facility," and thus only to comprehensive and extended care facilities, it would not preclude a provision such as § 8.11 in a contract for independent or assisted living—the other two residential-type services provided by a CCRC. If a person, such as Ruth, moved into an independent or assisted living unit pursuant to a CCRC Residence and Care Agreement containing such a provision, there would be no conflict with § 19–345(b) and she would, indeed, be precluded from unilaterally transferring assets so as to deplete her net worth. The question might arise, should she later need admission into a Medicaid-certified nursing home associated with the CCRC to deal with some temporary medical problem, whether HG § 19–345(b) would become applicable during the period of her stay in that facility, causing a

temporary suspension of the § 8.11 provision. That is not the case here, however, and we therefore need not address that situation. Sherwood was admitted directly into the nursing home and, at least at the time the judgment below was entered, had never left it. Indeed, unlike the situation in Ruth's agreement, the periodic fee was set in his Agreement at the $192/day rate for the nursing home.

The fact that a CCRC is subject to regulation under Art. 70B by the Department of Aging does not render HG § 19–345(b) inapplicable to a Medicaid certified nursing facility operated as part of the CCRC. There is nothing in that section that even suggests, much less directs, that it does not apply to a nursing facility connected with a CCRC and on the same campus with the independent and assisted living units that are also part of the CCRC, and, indeed, during consideration of the bill that enacted the provision, an effort to exempt CCRC's from part of its scope was rejected.[5] As a matter of

---

**5.** Prior to 1995, HG § 19–345(c) precluded a Medicaid certified facility from including in an admission contract a requirement that, to stay at the facility, the resident "continue as a private pay resident for more than 1 year, if the resident becomes eligible for Medicaid benefits" or from transferring or discharging a resident involuntarily because the resident became a Medicaid benefits recipient. 1995 Md. Laws, ch. 547 extended the preclusion to "any period" and thus eliminated the ability of such nursing facilities to require Medicaid-eligible residents to pay the private pay rate for up to one-year. That law also imposed a number of limitations and conditions on the discharge or transfer of nursing facility patients. The bill was introduced at the urging of the Attorney General and, in its introductory form, was strongly supported by the then-Office on Aging, the precursor agency to the current Department of Aging. Among other things, the bill added a new § 19–345.2, placing certain substantive and procedural limitations on the involuntary discharge or transfer of a nursing home patient. Section 19–345.2(b) required that certain information and medication be given to the patient or his representative at the time of transfer or discharge. Subsection (c)(1), which was more substantive, prohibited the non-consensual discharge or transfer of a patient, except to a safe and secure environment where the patient would be under the care of a licensed provider or one who agreed in writing to provide the appropriate environment. The House of Delegates added an amendment to the bill that would have allowed a facility to transfer a patient without his consent if the transfer was from a nursing facility in a CCRC to a different level of care within the same CCRC. The Attorney General's

basic statutory construction, we hold that § 19–345(b) applies to a Medicaid certified nursing facility, even when the nursing home is part of a CCRC.

### Approval by Department of Aging

As noted, Art. 70B of the Maryland Code subjects CCRC's to certain statutory requirements and to regulation by the Department of Aging. A person may not operate as a CCRC unless it receives a certificate of registration from that Department. *See* §§ 9 and 11 of Art. 70B. Section 13 contains certain requirements for CCRC agreements. Oak Crest points out that, prior to commencing its operation as a CCRC, it received a certificate of registration and that, in granting the certificate, the Department approved its CCRC Residence and Care Agreement and found it compliant with § 13. Oak Crest urges that the Department's determination that the agreement was compliant, and therefore lawful, must be given appropriate deference by the court.

Oak Crest's argument is a valid one, so far as it goes, but has no relevance to the issue before us. As we have indicated, there is nothing in Art. 70B or COMAR 32.02.01.28 that prohibits a provision like § 8.11. The conflict arises from § 19–345(b) of the Health General Article, which applies to Medicaid certified nursing facilities, not to CCRC's generally, and, so far as this case is concerned, arises from the more limited circumstance of the direct admission of a patient into such a nursing facility. The precise issue before us is one of first impression and does not appear to be one upon which the

---

Office, noting that the effect of that amendment was "to exempt residents of continuing care retirement facilities from the safeguards we have worked so hard to craft," informed the Senate that it opposed that amendment, as did the Department of Health and Mental Hygiene and the Office on Aging. The Office on Aging, in a letter from its Director, pointed out that it was not the intent of Art. 70B "to exclude CCRCs from laws applicable to nursing home requirements." Faced with that opposition, the Senate deleted that amendment and excused CCRC's only from the informational and medication requirements of subsection (b) if the transfer was to a lower level of care within the same facility in accordance with a contractual agreement. Even this limited attempt to exclude CCRC's from the effect of the restrictions failed.

Department of Aging has previously taken any position. As noted, however, its predecessor agency, the Maryland Office on Aging, had recorded its view in 1995 that it was not the intent of Art. 70B "to exclude CCRCs from laws applicable to nursing home requirements."

We see nothing either explicit or implicit in the Department of Aging's issuance of a certificate of registration to Oak Crest that suggests a determination on the Department's part that HG § 19–345(b) is not applicable to Renaissance Gardens. The Department's only concern, as expressed in its *amicus* brief in this case, is that any decision holding the anti-alienation clause ineffective be "limited to situations involving residents directly admitted into a Medicaid-participating nursing home that is a part of a CCRC." That is the only effect of our decision.

### *Certificate of Need*

As a general rule, a nursing facility may not operate without having received a Certificate of Need (CON) from the Maryland Health Care Commission. *See* HG § 19–120. Subject to certain conditions and limitations, § 19–114(d)(2)(ii) provides an exemption from that requirement for a CCRC. One of the conditions stated in that section is that the nursing facility be for the exclusive use of subscribers who, prior to entering the nursing facility, have executed continuing care agreements and paid entrance fees equal to the lowest fee charged for an independent or assisted living unit. That condition, enacted no doubt to avoid giving CCRC-operated nursing facilities an unfair advantage over stand-alone nursing facilities, would apparently preclude a CCRC without a CON from admitting a patient directly into its nursing facility.

■■■ Sections 19–123 and 19–124 provide limited exceptions to that condition. Section 19–123 states that a CCRC does not lose its CON exemption by admitting an individual directly into a nursing facility if the admittee's spouse, relative, or other person with whom the admittee has a long-term significant relationship is admitted at the same time to an indepen-

dent or assisted living unit within the CCRC community. Section 10–124 allows a CCRC that qualifies for a CON exemption to admit a subscriber directly into a comprehensive care nursing bed if, at the time of admission, the subscriber has "the potential for an eventual transfer" to an independent or assisted living unit, as determined by the subscriber's personal physician. Those appear to be the bases upon which Sherwood was admitted to Renaissance Gardens. Ruth was admitted contemporaneously into an independent living unit and, notwithstanding Sherwood's medical history and condition, his physician certified that he had "the potential for eventual transfer to an independent or assisted living unit at Oak Crest Village CCRC."

Oak Crest argues that, as Sherwood "no longer qualifies for admission to the CCRC (because he breached ¶ 8.11 of the CCRC Agreement when he alienated his assets), he no longer qualifies for the nursing home CON exemption" and therefore can no longer reside at Oak Crest's nursing facility. There may be several fallacies with that argument, but we need dwell only on one. The argument assumes, *a priori*, the validity of § 8.11. If, as we hold, § 8.11 is inconsistent with § 19–345(b) and, for that reason, is invalid, Sherwood is *not* in breach of the Residence and Care Agreement, and is certainly not in breach of the addendum to that agreement. Assuming that the doctor's certificate was not a sham, Sherwood was properly admitted under § 19–124 and probably under § 19–123 as well. Oak Crest produced no evidence that Sherwood is no longer potentially able to move to an independent or assisted living unit, as the physician's certificate opined, so we see no violation of the condition to the CON exemption.

### Policy Issues

Throughout its brief, Oak Crest asserts both the unfairness and the dreadful consequences of allowing people like Sherwood to agree to anti-alienation clauses like § 8.11 as a condition of being admitted to CCRC's that are so dependent upon such clauses and then, with impunity, violate them. As we have taken pains to point out, our decision in this case is a

limited one. It precludes such clauses from being enforced when patients are admitted directly into Medicaid certified nursing facilities, at least during the period that the patient continues to reside in the nursing facility. It does not otherwise invalidate those clauses. To find such a provision valid in the situation of a direct admission to a Medicaid certified nursing facility would be to ignore the clear language of the statute and obvious intent of the Legislature. If our enforcement of the statute creates unfairness or endangers the financial health of CCRC's, the address for relief should be made to the General Assembly.[6]

JUDGMENT AFFIRMED, WITH COSTS.

---

[6]. Although we have based our decision in this case solely on State law, there are Federal statutes and regulations of similar import that may limit the General Assembly's authority in this area. We do not address that issue here.