*Delford Mitchell Barnes v. State of Maryland,* No. 34, September Term 2013

**APPELLATE PROCEDURE — WAIVER AND PRESERVATION UNDER MARYLAND RULE 8-504 —** Under Maryland Rule 8-504, an appellant is required to articulate and adequately argue all issues the appellant desires the appellate court to consider in the appellant's initial brief. In cases of noncompliance with the Rule, the appellate court has the authority to dismiss the appeal or make any other appropriate order with respect to the case, although the appellate court may exercise its discretion to consider an argument not specifically raised in the appellant's brief.

**CRIMINAL PROCEDURE — EXECUTION OF WARRANT —** The courts are not to assess the lawfulness of police officers' conduct by resort to whether the officers could have accomplished their goal in a less intrusive manner; the relevant analysis, rather, is whether the conduct was reasonable within the meaning of the Fourth Amendment.

**CRIMINAL PROCEDURE — DE FACTO ARREST —** Some seizures covered under the Fourth Amendment constitute such limited intrusions on the personal security of those detained and are justified by such substantial law enforcement interests that they may be made on less than probable cause, so long as the police have an articulable basis for suspecting criminal activity. Seizures having the essential attributes of a formal arrest, on the other hand, are unreasonable under the Fourth Amendment unless they are supported by probable cause. There are no per se rules to determine at what point a seizure becomes a de facto arrest requiring probable cause.

Circuit Court for Prince George's County
Case No. CT 09-0699X
Argued:  December 9, 2013

IN THE COURT OF APPEALS
OF MARYLAND

No. 34

September Term, 2013

_____

DELFORD MITCHELL BARNES

v.

STATE OF MARYLAND

_____

Barbera, C.J.,
Harrell
Battaglia
Greene
Adkins
McDonald
Watts,

JJ.

_____

Opinion by Barbera, C.J.

_____

Filed:  March 5, 2014

The present appeal has its genesis in the commission of a double murder. Petitioner Delford Mitchell Barnes was indicted in connection with those crimes, tried before a jury in the Circuit Court for Prince George's County, and found guilty of two counts of first-degree murder and related offenses. Among the evidence the State used against Petitioner at trial was a candle the police found in a storage locker belonging to him. The candle was inscribed with death threats, apparently against one of the two murder victims.

Petitioner filed a pre-trial motion seeking suppression of the contents of the storage locker, including the candle, as the tainted fruit of the consent he had given the police to search the locker. He argued that the police had obtained his consent to conduct the search while he was unlawfully detained at the police station. The suppression court denied the motion, evidently reasoning that the police had obtained Petitioner's consent during their lawful detention of him. The Court of Special Appeals agreed with that ruling and affirmed the judgments of conviction. We too agree with the decision of the suppression court and therefore affirm the judgment of the Court of Special Appeals.

I.

The murders generating this criminal case came to light on January 14, 2009, when the Prince George's County Police Department received a 911 phone call from a friend of Seth Aidoo reporting his concern that he had not seen Mr. Aidoo or his girlfriend, Eunice Baah, in a few days. The police responded to Mr. Aidoo's home, which was located within a gated community in Upper Marlboro, Prince George's County. Upon entering the home, the police discovered the bodies of Mr. Aidoo and Ms. Baah in the basement and, shortly

thereafter, pronounced both victims dead. Later autopsies revealed that Mr. Aidoo died from multiple stab wounds and Ms. Baah died from a gunshot to her head. The doctor who performed the autopsies ruled both deaths homicides.

At some point on the night of the 911 call, the Police Department's Homicide and Forensic Services Units responded to the crime scene. The police processed the home for evidence and a murder investigation ensued. It was determined that Mr. Aidoo and Ms. Baah likely had been killed on the evening of January 12, 2009.

Detectives Anthony Schartner and William Watts and Corporal Benjamin Brown were assigned to investigate the murders. They learned during their investigation that Mr. Aidoo at one time lived at the Upper Marlboro residence with his wife, Sheila Aidoo, and her brother, Samuel Culley, Jr.[1] Ms. Aidoo moved from the home when the Aidoos separated and, shortly thereafter, Mr. Aidoo forced Culley to leave the home because of several confrontations between the two men. At the time of the murders, Ms. Aidoo, Culley, and Petitioner lived together in Ms. Aidoo's home in Springdale, Prince George's County.

The access gates to Mr. Aidoo's community were controlled by transponders. The police learned that Culley had obtained a transponder in March 2008, evidently while residing with his sister and Mr. Aidoo. Video surveillance of the entrance to the community revealed that, approximately two weeks before the murders, a Mercedes Benz registered to

_____

[1] Culley later pleaded guilty to participating in the murders of Mr. Aidoo and Ms. Baah.

-2-

Petitioner entered the community using the transponder issued to Culley. On the evening of the murders, a mini-van entered the community at 6:00 p.m. using the same transponder.[2] Detectives learned that Petitioner's cell phone had been powered off that evening from 5:00 p.m. until 2:15 a.m., which was inconsistent with Petitioner's "normal" cell phone usage.

On February 18, 2009, Detective Schartner applied for and obtained warrants to collect Petitioner's DNA and fingerprints and to search Ms. Aidoo's Springdale residence and Petitioner's Mercedes. Shortly after 6:00 p.m. on February 19, Corporal Brown, along with two other officers, conducted surveillance outside Ms. Aidoo's Springdale residence in preparing to execute the warrants. At approximately 6:40 p.m., Petitioner and two other individuals left the Springdale residence in Petitioner's Mercedes. The police stopped the vehicle one block from the residence. Corporal Brown identified himself as a detective with the Prince George's County Police Department, explained that he was investigating the murders of Mr. Aidoo and Ms. Baah, and advised Petitioner of the warrant to collect his DNA and fingerprints. Petitioner was asked, and he agreed, to go to the police station for the purpose of executing that warrant.[3]

Detective John Piazza transported Petitioner to the police station. Petitioner sat in the

---

[2] Testimony elicited at trial revealed that the mini-van belonged to Petitioner's brother, Sylvan Barnes. Because evidence of that fact was not presented to the suppression court, we do not consider it in our analysis of that court's ruling.

[3] Corporal Brown explained at the suppression hearing that the Police Department does not have "mobile fingerprinting facilities" and the station was "the only location [the police] had to" obtain Petitioner's DNA and fingerprints.

front passenger seat of the detective's vehicle and was handcuffed during the ride to the station. At the station, the police removed the handcuffs and placed Petitioner in a five-by-five-foot interview room. Petitioner was not restrained while in the room and the door to the room remained unlocked while he was inside. At some point, Petitioner asked to leave the interview room to use the restroom and was permitted to do so. During the next several hours, Petitioner made no other request to leave the room.

Meanwhile, other aspects of the investigation were ongoing. About the same time as Detective Piazza transported Petitioner to the police station, Detective Watts transported to the station the two passengers who had been riding with Petitioner when he was stopped. Other officers, including Detective Schartner and Corporal Brown, entered the Springdale residence to execute the search warrant. Corporal Brown left at 7:25 p.m., before the search concluded, in order to transport Ms. Aidoo to the police station for questioning. Upon arrival shortly before 8:00 p.m., Corporal Brown questioned Ms. Aidoo for approximately four hours. During the course of the interview, Corporal Brown left the interview room several times in order to check on Petitioner.

Sometime between 9:00 and 9:30 p.m., Detective Schartner and the other officers concluded the search of the Springdale residence. Detective Schartner drove from the residence directly to the police station. Corporal Brown testified at the suppression hearing that "there was no one available" to recover Petitioner's DNA and fingerprints until after the police had completed the search of the Springdale residence.

At approximately 10:15 p.m., Detectives Schartner and Watts entered the interview room in which Petitioner was waiting, took a DNA swab from his mouth, then left. The detectives returned at 10:47 p.m., took Petitioner's fingerprints, then escorted him to the restroom so he could wash his hands.

At 10:53 p.m., Detectives Schartner and Watts returned Petitioner to the interview room, where they immediately questioned him about a storage locker, a rent-payment receipt for which the police discovered during the search of the Springdale residence.[4] After Petitioner confirmed that the storage locker belonged to him, the detectives asked for his consent to search it, and Petitioner said "yes." At 11:00 p.m., he signed a form consenting to the search of the locker.[5]

During the search of the storage locker, the police recovered a candle containing a hand-etched message, apparently about Mr. Aidoo. The message included several references to "Seth's" suffering injury or death, such as "I wish you would burn in a house fire," "I wish you will drown in water," "I want you to take a knife & kill yourself," "Seth please die," and

---

[4] It was not clear from the testimony of the officers during the suppression hearing how they learned about the storage locker. At trial, Detective Schartner testified that investigators recovered the rent-payment receipt from the master bedroom of the Springdale residence. Petitioner does not raise here a challenge to the search of the home that led to the discovery of the receipt.

[5] Petitioner remained in the interview room after signing the form consenting to the search of his storage locker. At 1:30 a.m., Corporal Brown entered the interview room and questioned Petitioner for approximately a half hour. After the interview, Corporal Brown escorted Petitioner to the front door of the police station and Petitioner "was allowed to leave out the front door." The suppression court suppressed a statement that Petitioner made to Corporal Brown during that half-hour interrogation.

"I just want you to die die die die die die die die die." The message also included what evidently was intended to be Mr. Aidoo's home address.[6]

The State ultimately charged Petitioner with the premeditated murders of Mr. Aidoo and Ms. Baah, conspiracy to commit murder, use of a handgun in commission of a felony, and burglary.

*Suppression Hearing and Trial*

Petitioner argued at the suppression hearing that the evidence found in the storage locker, including the candle, was the tainted fruit of his consent obtained during an unlawful detention. In making that argument, Petitioner focused primarily upon the several hours he spent at the police station before giving consent to the search of the locker.[7] Petitioner's argument had two parts: First, at some point during the three hours it took the police to execute the warrant to collect his DNA and fingerprints, he was under de facto arrest without the requisite probable cause, and he remained unlawfully under arrest when, upon being returned to the interview room following the trip to the restroom, the police obtained his consent to search the locker. Second, even if the several-hour delay in executing the warrant to collect his DNA and fingerprints did not constitute an unlawful de facto arrest, his continued detention upon returning to the interview room was itself an unlawful arrest. The

---

[6] The address etched on the candle was "145118 Tuner Wootton Pkwy." The address of Mr. Aidoo's home was 14518 Turner Wootton Parkway.

[7] Petitioner does not raise here a challenge to the initial stop or transport to the police station.

-6-

court denied the motion to suppress the candle, evidently reasoning that Petitioner was not under de facto arrest at any time before consenting to the search.[8]

At trial, the candle recovered from Petitioner's storage locker was admitted into evidence over his objection. The jury found Petitioner guilty of two counts of first-degree, premeditated murder, use of a handgun in the commission of a felony, and conspiracy to commit murder.

## *The Appeal*

On appeal to the Court of Special Appeals, Petitioner argued that the candle should have been suppressed as the product of an unlawful detention. The Court rejected the argument, reasoning that Petitioner's "detention up until the time that he was fingerprinted was a reasonable amount of time to comply with the warrant," and his subsequent brief detention was based on reasonable suspicion that he had committed the murders.

We granted Petitioner's petition for a writ of certiorari to consider the following questions posed by Petitioner:

> 1. When police have detained and transported a suspect to a police station in an on-going criminal investigation for the limited purpose of executing [a] search and seizure warrant[] for his DNA and fingerprints, and the objective of the warrant[] has been completed, does continued detention of the person,

---

[8] The court did not rule expressly that Petitioner was lawfully detained at the time he consented to the search of the storage locker. Yet, given the arguments Petitioner advanced at the suppression hearing, we readily can, and do, infer that the court rejected those arguments and determined there had been no unlawful detention. We note incidentally that Petitioner does not argue that his consent was involuntary in the sense contemplated by *Schneckloth v. Bustamonte*, 412 U.S. 218, 223 (1973).

absent probable cause to arrest, amount to an unlawful detention in violation of the Fourth Amendment, or may the continued detention be justified by reasonable suspicion that the person committed the crime under investigation?

2. Was the detention justified under the applicable standard?

3. When police have seized and transported an individual to a police station in order to execute a search of the person, is it reasonable for police to prolong the detention by withholding execution of the search warrant pending a search of the person's residence?

4. Was [Petitioner's] detention prior to the execution of the DNA and fingerprint warrant[] reasonable under the applicable standard?

We also granted the State's conditional cross-petition, which asks:

Did [Petitioner] fail to raise the Fourth Amendment unlawful detention claim in his initial brief before the Court of Special Appeals where the only argument raised was that the continued detention rendered the subsequent consent to search involuntary?

II.

We first consider the State's claim that Petitioner has not preserved for our consideration all the questions on which we granted the writ. The State's argument relies on Maryland Rules 8-504 and 8-303.

The State argues that Petitioner is foreclosed from having this Court consider certain of his arguments because, in the Court of Special Appeals, he failed to comply with Rule 8-504(a). Under that Rule, "[a]n appellant is required to articulate and adequately argue all issues the appellant desires the appellate court to consider in the appellant's initial brief." *See* Md. Rule 8-504(a)(6); *Oak Crest Vill., Inc. v. Murphy*, 379 Md. 229, 241 (2004). In cases of noncompliance with the Rule, the appellate court has the authority to "dismiss the

appeal or make any other appropriate order with respect to the case," *see* Md. Rule 8-504(c), although the appellate court may exercise its discretion to consider an argument not specifically raised in the appellant's brief. *Moosavi v. State*, 355 Md. 651, 661 (1999).

The State asserts that, in his opening brief to the Court of Special Appeals, Petitioner did not argue sufficiently that his consent to search the storage locker was the product of an unlawful detention, thereby tainting the fruits of the search, including the candle. According to the State, the "Court of Special Appeals erred in finding the argument fairly presented" to that Court. We disagree.

We have reviewed Petitioner's "Brief of Appellant" filed in the Court of Special Appeals and are satisfied that it contains factual allegations, legal argument, and citations to authority in support of the claim that his detention was unlawful. We take all of that to include, as necessarily following therefrom, that the consent Petitioner gave during his detention was unlawfully obtained. The arguments laid out in the brief, though scant, were not merely "implicit," which, even so, would have been sufficient for the intermediate appellate court to consider. *See Grant v. State*, 414 Md. 483, 489 n.2 (2010) (explaining that the petitioner's claim was properly before the Court of Appeals because the claim was "implicit in the arguments set forth by [the petitioner] in his briefs in the intermediate appellate court"). Moreover, to the extent the State was prejudiced by the organization of Petitioner's brief and his apparent conflation of the "unlawful detention" argument with other Fourth Amendment issues, the Court of Special Appeals cured any such prejudice when it

granted the State's request, made after oral argument, to submit a supplemental brief in order to address that issue. *See Murphy*, 379 Md. at 242 ("We shall address the substantive conflict issue, notwithstanding [Petitioner's] failure to properly present it . . . mostly because it does not appear that [Respondent] was prejudiced."). Petitioner's claim that he was under de facto arrest when he consented to the search of the storage locker is properly before us for consideration.

The State separately argues, relying upon Maryland Rule 8-303(b)(1), that Petitioner did not argue adequately in his petition for writ of certiorari that the detectives failed to execute timely the search warrant for his DNA and fingerprints. Again, we disagree.

Maryland Rule 8-303(b)(1), which governs the contents of petitions for writ of certiorari, provides: "The petition shall present accurately, briefly, and clearly whatever is essential to a ready and adequate understanding of the points requiring consideration," including a "concise argument in support of the petition." Two of the four questions presented in the petition relate to whether the police unreasonably "prolong[ed]" Petitioner's initial detention at the police station and he explained in the petition his argument on that claim. We therefore consider that claim, as well.

III.

Petitioner's questions implicate the correctness of the suppression court's ruling denying the motion to suppress the candle seized during the search of the storage locker. In answering those questions, "we must rely solely upon the record developed at the suppression

hearing." *See Briscoe v. State*, 422 Md. 384, 396 (2011). "We view the evidence and inferences that may be drawn therefrom in the light most favorable to the party who prevails on the motion," *id.*, here, the State. We defer to the suppression court's factual findings and uphold them unless they are shown to be clearly erroneous. *State v. Luckett*, 413 Md. 360, 375 n.3 (2010). The credibility of the witnesses and the weight to be given to the evidence fall within the province of the suppression court. *Gonzalez v. State*, 429 Md. 632, 647-48 (2012). "We, however, make our own independent constitutional appraisal, by reviewing the relevant law and applying it to the facts and circumstances of this case." *Lee v. State*, 418 Md. 136, 148-49 (2011) (citation omitted).

None of the evidence pertinent to the issues raised in this appeal was in dispute. Moreover, the suppression court's ruling reflects the court's having credited the testimony of Corporal Brown and Detectives Schartner and Watts concerning their actions prior to obtaining Petitioner's consent to search the storage locker. We therefore accept the officers' version of events as we analyze the parties' legal arguments.

IV.

The Fourth Amendment to the United States Constitution, which is applied to the states through the Due Process Clause of the Fourteenth Amendment, protects against unreasonable searches and seizures. Any non-consensual detention is a "seizure" of the person within the meaning of the Fourth Amendment. Such seizures fall into either of two categories: (1) an arrest—whether formal or de facto—requiring the police to have probable

cause to believe that the arrestee has been involved in criminal activity, *see Maryland v. Pringle*, 540 U.S. 366, 370 (2003); or (2) a more limited restraint of the person based on the officer's reasonable suspicion that criminal activity is afoot, *Terry v. Ohio*, 392 U.S. 1, 30-31 (1968). The latter, temporary detention of the person typically, though not necessarily, occurs on the street and is commonly referred to as a "stop."

An officer who possesses the requisite suspicion for a stop is authorized to detain the person for a reasonable period of time, measured by the particular facts and circumstances at hand, in order to investigate the suspected criminal behavior. *See id.* If, during that time, the officer's suspicion ripens into probable cause to believe the individual has committed or is committing a crime, then an arrest lawfully may ensue. But if the officer does not develop either probable cause for an arrest or reasonable suspicion for a "superseding stop," then the officer must immediately release the detainee. Any continued detention, unsupported by the requisite suspicion, is unreasonable and, consequently, in violation of the Fourth Amendment. *See Michigan v. Summers*, 452 U.S. 692, 700 (1981). Generally speaking, evidence obtained directly or derived from an unlawful seizure must be suppressed as the tainted "fruit" of the seizure. *See Wong Sun v. United States*, 371 U.S. 471, 484-85 (1963).

"In determining whether an investigatory stop is in actuality an arrest requiring probable cause, courts consider the 'totality of the circumstances.'" *In re David S.*, 367 Md. 523, 535 (2002). Not every seizure of a person is "elevated automatically into an arrest," *id.*, simply because the police used "measures . . . more traditionally associated with arrest than

-12-

with investigatory detention," such as handcuffing a suspect or placing him or her in a police cruiser. *See id.* at 534 (quoting *United States v. Tilmon*, 19 F.3d 1221, 1224-25 (7th Cir. 1994)). Likewise, not every entry onto police "turf," such as a police station, transforms a seizure into an arrest. *See* 4 Wayne R. LaFave, Search and Seizure § 9.2(g), at 357 (4th ed. 2004). "[T]he brevity of the invasion of the individual's Fourth Amendment interests," although not dispositive, is an "important factor in determining whether the seizure is so minimally intrusive as to be justifiable on reasonable suspicion." *United States v. Place*, 462 U.S. 696, 709 (1983).

Petitioner does not dispute at this juncture of the case that he was "lawfully detained and transported" to the police station for the purpose of executing a judicially authorized warrant for his DNA and fingerprints. Petitioner further concedes that his initial detention at the police station was necessary in order to carry out the warrant for his DNA and fingerprints.[9] Instead, focusing solely upon the length of his detention prior to the police executing the warrant, Petitioner argues that, as the delay approached three hours, the detention became a de facto arrest unsupported by probable cause. Petitioner alternatively argues that, even if not by that time, he was under an unlawful de facto arrest when he was returned to the interview room following his trip to the restroom. Either way, as Petitioner sees it, his consent to the search of the locker—and the candle seized during that search—are

---

[9] The State does not attempt to characterize as purely voluntary the time Petitioner spent at the police station pending execution of the warrant to collect his DNA and fingerprints.

the tainted fruit of that unlawful arrest.

The State, unsurprisingly, disagrees. Notably, the State does not argue that the police possessed the requisite probable cause to arrest Petitioner at the time they secured his consent to search the storage locker. Indeed, when questioned on that subject during oral argument before this Court, the State acknowledged that it was a "close call" whether the police had probable cause to arrest Petitioner at the time he consented. Given the State's position, we shall assume, arguendo, that the police did not have probable cause to arrest Petitioner when they obtained his consent to search the locker.

The State maintains that Petitioner's consent was obtained while he was lawfully detained at the police station. The State argues that the delay in executing the warrant to collect Petitioner's DNA and fingerprints was justified by the detectives' attention to other aspects of the investigation, including executing the warrant to search the Springdale residence. The State further argues that the continued detention of Petitioner following the trip to the restroom was "an investigatory detention" justified by the detectives' reasonable suspicion that he was involved in the murders.

*The Initial Detention*

In determining whether Petitioner was unlawfully detained at the police station before consenting to a search of his storage locker, we begin with his claim that the detectives unreasonably delayed the collection of his DNA and fingerprints. The central premise of this claim is that the detectives could have, and therefore should have, executed the warrant

-14-

earlier. In order to address the contention, we consider the evidence developed before the suppression court on this point.

The officers' testimony discloses the following chronology of events:

- After the police stopped Petitioner's vehicle at approximately 6:40 p.m., Detective Watts transported to the police station the two individuals who were with Petitioner.

- Detective Piazza transported Petitioner to the police station.

- Meanwhile, Corporal Brown and Detective Schartner assisted in executing the search warrant for the Springdale residence.

- Corporal Brown left the Springdale residence with Ms. Aidoo and arrived at the police station around 8:00 p.m. to interview her.

- By the time Corporal Brown arrived at the station, some of the detectives assigned to the murder investigation were still searching the Springdale residence.

- Detective Schartner finished searching the Springdale residence between 9:15 and 9:30 p.m. and then drove directly to the police station.

- Detectives Schartner and Watts obtained Petitioner's DNA and fingerprints between 10:15 and 10:53 p.m.

- Corporal Brown remained involved in the questioning of Ms. Aidoo until after midnight.

Petitioner does not challenge this timeline of events. He maintains, though, that at least one detective assigned to the investigation could have collected his DNA and fingerprints shortly after his arrival at the police station and "released [him] by 8:00 p.m."

The courts are not to assess the lawfulness of police officers' conduct by resort to whether the officers accomplished their goal in the "least intrusive" manner; the relevant

-15-

analysis, rather, is simply whether the conduct itself was reasonable within the meaning of the Fourth Amendment. *See*, *e.g.*, *City of Ontario v. Quon*, 130 S. Ct. 2619, 2632 (2010) (citations omitted) (stating that the Court has "repeatedly refused to declare that only the 'least intrusive' search practicable can be reasonable under the Fourth Amendment"); *United States v. Sokolow*, 490 U.S. 1, 11 (1989) (stating that the reasonableness of the officer's decision to stop an individual does not turn on the availability of less intrusive investigatory techniques). We are not to "indulge in unrealistic second-guessing" of the detectives' investigative strategy during what, at the time, was a swiftly developing murder investigation. *See United States v. Sharpe*, 470 U.S. 675, 686 (1985). Indeed, that "[a] creative judge engaged in post hoc evaluation of police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished" is of no moment in the analysis. *Id.* at 686-87. We therefore do not speculate about whether the police in this case could have executed the warrant for Petitioner's DNA and fingerprints sooner than they did; rather, we examine the record to ascertain the reasonableness of the delay.

Corporal Brown testified at the suppression hearing that no officer was available to obtain Petitioner's DNA and fingerprints at the police station until after the police finished searching the Springdale residence at approximately 9:30 p.m. Additional evidence elicited at the suppression hearing supports the corporal's claim. Detective Schartner and Corporal Brown testified that they were busy with other aspects of the investigation during the hours leading up to the execution of the warrant for Petitioner's DNA and fingerprints—Detective

Schartner was assisting in the search of the Springdale residence and Corporal Brown was interviewing Ms. Aidoo. Given these facts and circumstances, all of which were accepted by the suppression court, we hold that the approximately three-hour delay in executing the warrant for Petitioner's DNA and fingerprints was not unreasonably long as to constitute a de facto arrest.

*The Continued Detention*

We turn next to Petitioner's alternative contention that his continued detention after the police executed the warrant for his DNA and fingerprints, and before Petitioner consented to a search of his storage locker, was a de facto arrest without the requisite probable cause. Petitioner's argument reduces to the assertion that the cumulative circumstances of his detention, beginning with the stop of his vehicle at approximately 6:40 p.m. and ending with his brief detention in the interview room after the police collected his DNA and fingerprints, are relevant to our analysis of whether his continued detention constituted an unlawful arrest. We have not had occasion to address the specific question raised by Petitioner—namely whether we must consider *all* the circumstances leading up to his giving consent to search the locker or only those after the police obtained his DNA and fingerprints—in determining whether the continued detention was a de facto arrest. Nevertheless, there is instructive case law on the subject.

One line of cases involves lawful traffic stops followed immediately by other police activity that, depending on what the police knew and did at the time, was either lawful Fourth

Amendment conduct, or not. It is settled law that "the detention of a [driver] 'must . . . last no longer than is necessary to effectuate the purpose of the [traffic] stop,'" and once the purpose of the traffic stop has been satisfied, "the continued detention of the car and the occupants amounts to a second detention" requiring either the driver's consent or reasonable suspicion that criminal activity is afoot. *Ferris v. State*, 355 Md. 356, 369, 372 (1999) (citations omitted). Just as we have "drawn a bright line, demarcating the point at which an ordinary traffic stop ends" and a "continued detention" of a driver begins, *see State v. Green*, 375 Md. 595, 610 (2003), we similarly draw a bright line between a lawful detention of a person in order to execute a warrant to collect DNA and fingerprint evidence and the continued detention of that person following execution of the warrant.

The State argues that the continued detention of Petitioner—up to the moment when he consented to a search of the storage locker—was not a de facto arrest but rather a *Terry*-type seizure justified at its inception by the police officers' reasonable suspicion that he was involved in the murders of Mr. Aidoo and Ms. Baah. As we consider the State's contention, we bear in mind the Supreme Court's recent admonition that "[a]n exception to the Fourth Amendment rule prohibiting detention absent probable cause must not diverge from its purpose and rationale." *Bailey v. United States*, 133 S. Ct. 1031, 1038 (2013).

Detectives Schartner and Watts returned Petitioner to the same interview room in which he had awaited execution of the DNA and fingerprints warrant. Detectives Schartner and Watts asked Petitioner only "a moderate number of questions" in order to obtain

-18-

information about the locker, *see Crosby v. State*, 408 Md. 490, 506 (2009) (citation omitted), thereby pursuing a means of investigation that was likely to confirm or dispel reasonably quickly the detectives' suspicions that the storage locker might belong to him. The detectives concluded their interview, approximately seven minutes after it started, upon obtaining Petitioner's consent to search the locker.

*Dunaway v. New York*, 442 U.S. 200 (1979), upon which Petitioner relies for the proposition that the "circumstances surrounding [his] detention had all the essential attributes of a formal arrest," is inapposite. In *Dunaway*, detectives investigating a murder received a lead from an informant implicating a potential suspect in the crime. 442 U.S. at 202-03. The detectives then "pick[ed] up" the suspect at his neighbor's house, transported him to police headquarters in a police car, and placed him in an interrogation room, where he was questioned by officers and eventually offered the police incriminating information. *Id.* at 203.

The Supreme Court held that "the detention of [the suspect] was in important respects indistinguishable from a traditional arrest," and the police therefore needed probable cause to arrest him. *See id.* at 212-13. The Court dismissed the State's argument—similar to the argument the State makes here—that "seizures such as [the one] in this case may be justified by mere reasonable suspicion." *Id.* at 211 (internal quotations omitted). According to the Court, "any exception that could cover a seizure as intrusive as that in this case would threaten to swallow the general rule that Fourth Amendment seizures are reasonable only if

-19-

based on probable cause." *Id.* at 213 (internal quotations omitted).

*Dunaway* differs from the present case in at least one critical fact. In *Dunaway*, the only basis the detectives had to transport the suspect to the police station and detain him there was their suspicion that he may have committed a crime. *See id.* at 203. Accordingly, what the State claimed to be an investigatory stop of the suspect began the moment the detectives picked him up at his neighbor's home, without a warrant, and continued through the point at which he offered incriminating information to the police, at the stationhouse. Here, by contrast, the detectives, armed with a proper warrant for Petitioner's DNA and fingerprints, lawfully transported him to the police station and detained him in the interview room in order to execute the warrant. The subsequent investigatory detention of Petitioner did not begin until *after* the detectives had executed that warrant, shortly before 11:00 p.m. Simply stated, the brief investigatory detention before us—a few minutes at the police station in the same room Petitioner had been detained lawfully in order to execute a judicially authorized warrant for his DNA and fingerprints—is significantly less intrusive than the prolonged detention at issue in *Dunaway*.

In short, the facts of this case do not suggest a de facto arrest, and we so hold. The detention consequently did not "demand a standard as stringent as probable cause." *See Crosby*, 408 Md. at 506 (citation omitted). Instead, reasonable suspicion was the required level of justification for the detention. Petitioner contends that the police did not have reasonable suspicion that he committed the murders because there was no evidence

connecting him to the murders. We disagree.

The Supreme Court has described reasonable suspicion as "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Illinois v. Wardlow*, 528 U.S. 119, 128 (2000) (quoting *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)). "Reasonable suspicion is a less demanding standard than probable cause . . . in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause." *Alabama v. White*, 496 U.S. 325, 330 (1990). Importantly, the evidence available to the police at the time of the limited seizure of an individual "must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." *Cartnail v. State*, 359 Md. 272, 288 (2000) (quoting *Cortez*, 449 U.S. at 418).

At the time Detectives Schartner and Watts returned Petitioner to the interview room to question him about the storage locker, they had, at the least, reasonable suspicion that he was involved in the murders of Mr. Aidoo and Ms. Baah. The detectives learned during the course of their investigation that Petitioner lived with Mr. Aidoo's brother-in-law, Culley, whom Mr. Aidoo forced to leave his home several months before the murders because of several confrontations between the two men. The detectives also learned that Culley had been issued a transponder giving him access to Mr. Aidoo's gated community and Petitioner's vehicle had been observed entering Mr. Aidoo's community using Culley's transponder less than two weeks before the murders. In addition, the detectives learned that

-21-

Petitioner's cell phone had been powered off on the evening of the murders from 5:00 p.m. until 2:15 a.m. As our colleagues on the Court of Special Appeals concluded, these facts, which Petitioner does not challenge, "provided the basis for the search warrant for [Petitioner's] DNA and fingerprints, and they provided at least reasonable suspicion . . . that he was involved in the murders."

In sum, Detectives Schartner and Watts needed only reasonable suspicion to conduct the investigatory detention of Petitioner that followed their execution of the warrant for his DNA and fingerprints. The detectives, at the inception of that subsequent detention, possessed the requisite reasonable suspicion that Petitioner was involved in the murders of Mr. Aidoo and Ms. Baah. Consequently, there is no merit to Petitioner's claim that the police obtained his consent to search his locker while unlawfully detained, and the suppression court correctly ruled that Petitioner was not entitled to suppression of the candle found in the locker. We therefore affirm the judgment of the Court of Special Appeals, which came to the same conclusion.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED; COSTS TO BE PAID BY PETITIONER.**