*Davinder Singh v. State of Maryland*, No. 36, September Term, 2025. Opinion by Eaves, J.

**INVESTIGATIVE DETENTION – REASONABLENESS – NO DE FACTO ARREST**

The Supreme Court of Maryland held that the placement of an individual in a nearby patrol car does not per se transform a lawful investigatory detention into a de facto arrest. Under the totality of the circumstances, the Supreme Court held that the investigative detention of the petitioner was reasonable where the record showed that the petitioner was placed in the police cruiser for slightly more than one hour while law enforcement carried out its initial investigation of a fatal accident that the petitioner was believed to have caused, which occurred in a well-trafficked public setting.

**MD. CODE ANN., CTS. & JUD. PROC. § 10-303 – APPREHENDED**

Under § 10-303(a)(2) of the Courts and Judicial Proceedings Article of the Maryland Annotated Code ("CJP"), a test used to determine an individual's alcohol concentration must occur within two hours of that individual being "apprehended." In *Willis v. State*, 302 Md. 363, 376 (1985), the Supreme Court of Maryland held that an apprehension under CJP § 10-303(a)(2) occurs when law enforcement (1) "has reasonable grounds to believe that the person is or has been driving a motor vehicle while intoxicated or while under the influence of alcohol" *and* (2) "reasonably acts upon that information by stopping or detaining the person." Here, the Supreme Court of Maryland held that law enforcement complied with CJP § 10-303(a)(2) when it conducted a breath test on petitioner more than two hours after initially subjecting him to an investigatory detention. Although law enforcement detained the petitioner at 7:30 a.m., the Supreme Court held that law enforcement did not "apprehend" the petitioner under CJP § 10-303(a)(2) until 8:51 a.m. Because the petitioner's breath test was conducted at 10:15 a.m., it occurred within CJP § 10-303(a)(2)'s two-hour window, and the results of that test were admissible.

Circuit Court for Montgomery County
Case No. C-15-CR-23-000025
Argued: January 5, 2026

IN THE SUPREME COURT

OF MARYLAND

No. 36

September Term, 2025

_____

DAVINDER SINGH

v.

STATE OF MARYLAND

_____

Fader, C.J.,
Watts,
Booth,
Biran,
Gould,
Eaves,
Killough,

JJ.

_____

Opinion by Eaves, J.

_____

Filed: May 26, 2026

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

# I
# INTRODUCTION

This case presents issues regarding the reasonableness of an individual's investigatory detention, as well as the State's compliance with certain procedures for conducting a breath test when law enforcement has apprehended an individual for operating a vehicle under the influence of alcohol. Petitioner, Davinder Singh, fatally struck two pedestrians with his vehicle around 7:00 a.m. on November 8, 2022. Responding law enforcement arrived around 7:30 a.m., told Mr. Singh that he was not free to leave the scene because of his involvement in the collision, and placed Mr. Singh in the back of a police cruiser at roughly 7:43 a.m. while an investigation ensued. As part of the police department's protocol for responding to collisions, a Drug Recognition Expert ("DRE") was notified.[1] Around 8:51 a.m.—slightly more than one hour after Mr. Singh was placed into the police cruiser—a DRE instructed Mr. Singh to exit the vehicle so that she could conduct standard field sobriety tests ("SFSTs"). The DRE's observations and the results of those tests all indicated that Mr. Singh had operated his vehicle under the influence of alcohol. It was at that point, around 9:13 a.m., that Mr. Singh was formally arrested and

---

[1] A DRE is a "police officer who is trained to recognize impairment in drivers who are under the influence of drugs other than, or in addition to, alcohol." Md. State Police, *Md. Drug Recognition Expert* (Mar. 18, 2026), https://perma.cc/2E8Y-GU4V. DRE "protocols were originally developed by the Los Angeles Police Department as a means of detecting drivers who are impaired by controlled substances." *Bailey v. State*, 412 Md. 349, 359 n.1 (2010). By the 1980s, "the National Highway Traffic Safety Administration and the International Association of Chiefs of Police developed a certification and training program" for DRE officers. *Id*. DREs have training in both alcohol and drug detection, and the tests to determine which substance might be impairing an individual "are very similar" in that a DRE is looking for "additional clues or observations" beyond those that an officer solely trained in recognizing impairment from alcohol would recognize.

transported to the police station to undergo a breath test. The breath test, which was conducted at 10:15 a.m., revealed an alcohol concentration of 0.24—three times the legal limit. Mr. Singh eventually was charged with a ten-count indictment relating to that incident. Mr. Singh pleaded not guilty to an agreed-upon statement of facts and was subsequently convicted on all ten counts. The Appellate Court of Maryland affirmed his convictions.[2]

We granted a writ of certiorari[3] to answer the following questions, which we have condensed and rephrased:[4]

---

[2] *Singh v. State*, No. 2430, 2025 WL 1732804, at *1 (Md. App. Ct. June 23, 2025).

[3] *Singh v. State*, 492 Md. 413 (2025).

[4] The questions for which we originally granted certiorari review were:

1. As a matter of first impression, does placing someone in the back seat of a police car constitute a display of force that converts an investigative detention into a de facto arrest requiring probable cause, when the display of force was not needed to protect officer safety or prevent flight?

2. Was Petitioner subjected to a de facto arrest requiring probable cause when police placed him in the back seat of a police car with the doors shut for more than an hour and there was no evidence he was a threat to officer safety or a flight risk, as evidence by the fact that officers never frisked Petitioner and, when asked, testified they placed Petitioner in the police car because they wanted to "move him from the scene" of the accident and because they were "instructed" to do so?

3. Was Petitioner apprehended for the purposes of Md. Code, Courts and Judicial Proceedings, § 10-303 when he was placed in the police car at 7:43 a.m., such that the breath test that was conducted at 10:15 a.m. violated the statute's two-hour time limit, requiring the exclusion of the results?

2

1. Did Mr. Singh's investigatory detention exceed the bounds of reasonableness, thereby transforming his investigative detention into a de facto arrest requiring probable cause to maintain his detention?

2. Did the State comply with § 10-303(a)(2) of the Courts and Judicial Proceedings Article ("CJP") of the Maryland Annotated Code (2020 Repl. Vol.), which requires that a specimen of breath for the purpose of determining alcohol concentration be taken within two hours after the person accused is apprehended?

For the reasons discussed below, we hold that, prior to his formal arrest, Mr. Singh's investigatory detention was reasonable under the totality of the circumstances and did not transform into a de facto arrest. We also hold that Mr. Singh was apprehended under CJP § 10-303(a)(2), at the earliest, by 8:51 a.m. and that the State complied with the two-hour time limit when it obtained the breath test results at approximately 10:15 a.m. We, therefore, affirm the judgment of the Appellate Court and Mr. Singh's convictions.

## II
## BACKGROUND

### A. *Factual Background*

On the morning of November 8, 2022, Angel Ortiz and Ana Margarita Ortiz, a married couple, set out on a morning walk. A little after 7:00 a.m., the Ortizes crossed the street in front of Fields Road Elementary School. At that moment, Mr. Singh struck the Ortizes with his vehicle, resulting in the Ortizes' deaths.

Gaithersburg Police Officer Cody Smorse was one of the first officers to arrive on the scene at approximately 7:24 a.m. Mr. Ortiz was lying in the street within "a couple of

3

feet" of Mr. Singh's vehicle, while Mrs. Ortiz lay further down the road. Officer Smorse initially assisted with the medical treatment of the Ortizes, but he quickly turned over that responsibility to fire and rescue, which arrived about one minute later. Officer Smorse then began investigating the events by directing his attention to Mr. Singh, whom Officer Smorse noticed was standing next to his vehicle and that the vehicle's windshield was "caved in[.]" Officer Smorse requested that Mr. Singh surrender his driver's license, which, after some confusion, Mr. Singh provided and Officer Smorse retained.[5] As they talked, Mr. Singh asked Officer Smorse if he was free to leave, and Officer Smorse informed Mr. Singh that he was not, given that "two people . . . possibly just lost their lives after [Mr. Singh] had struck them."

Around 7:40 a.m., it was brought to Officer Smorse's attention that the keys to Mr. Singh's vehicle remained in the ignition, so Officer Smorse promptly removed and retained Mr. Singh's keys. Throughout his interactions with Mr. Singh, Officer Smorse, who was trained in administering SFSTs, did not "smell any odor of alcohol [emanating] from [Mr. Singh,]" and Officer Smorse relayed to his colleagues that while "it [did not] necessarily appear that [Mr. Singh] was intoxicated," for example, because he did not have bloodshot eyes, Mr. Singh nevertheless "seemed off and . . . [did not] seem . . . sober." At no point during his interaction with Mr. Singh did Officer Smorse draw his service weapon, place Mr. Singh in handcuffs, or verbally threaten Mr. Singh.

---

[5] Officer Smorse testified that a different law enforcement official, Corporal Thompson, had previously asked for Mr. Singh's license, registration, and proof of insurance. When asked whether he or Cpl. Thompson took custody of Mr. Singh's driver license, Officer Smorse stated that they "eventually found it."

At that point, Gaithersburg Police Officer Brooke Vanderford, who had arrived on scene with Officer Smorse, approached Mr. Singh. Officer Vanderford escorted Mr. Singh to her patrol car, stating, "you are going to come sit in my car[.]" Although Officer Vanderford was instructed by a member of the "command staff" to place Mr. Singh in her cruiser, she also informed Mr. Singh that she was escorting him to her cruiser so that he did not have to watch ongoing attempts to provide life-saving treatment to the Ortizes. Mr. Singh remained in Officer Vanderford's cruiser for a little over an hour, until approximately 8:51 a.m.

During that time, Officer Vanderford would enter and exit the police cruiser while Mr. Singh remained in the back. While in her vehicle with Mr. Singh, Officer Vanderford noticed an odor that she could not quite place. Although Officer Vanderford was trained in SFSTs and had conducted "a lot of routine DUI stops and arrests[,]" she specifically noted in her conversations with colleagues that she did not believe the odor to be alcohol. While in Officer Vanderford's cruiser, emergency medical personnel checked on Mr. Singh, but Officer Vanderford could not remember any conversation between Mr. Singh and medical personnel, nor could she recall whether Mr. Singh received any medical treatment. Around 8:00 a.m., Mr. Singh asked Officer Vanderford for some water and his anxiety medication, as he believed he might be experiencing a panic attack. Mr. Singh was not provided any water, and his anxiety medication was located at his house. As with Officer Smorse, Officer Vanderford's interactions with Mr. Singh did not include a formal arrest or use of force against Mr. Singh.

As the events above transpired, other law enforcement units began their own

5

response. For example, around 7:30 a.m., the captain of the traffic division called to the scene Detective Corporal Alexa Briscoe of the Montgomery County Police Department's Collision Reconstruction Unit ("CRU").[6] Based on information she received while en route to the scene, Det. Cpl. Briscoe requested a DRE to evaluate Mr. Singh. Montgomery County Police Department policy requires that DREs carry out SFSTs and other evaluations for any fatal collisions involving suspected drug or alcohol use. As she responded to the scene, Det. Cpl. Briscoe received information that Mr. Singh exhibited unusual behavior, but that the responding officers could not say whether this behavior was the result of alcohol consumption, drug use, a combination of alcohol and drugs, or mental illness. Thus, Det. Cpl. Briscoe stated that she "erred on the side of [requesting] a [DRE,]" as they have "the most advanced training" of the available options. Even when it is "remotely wishy-washy" "whether there's any indication of impairment," Det. Cpl. Briscoe would always request a DRE.

Det. Cpl. Briscoe arrived at the scene around 8:12 a.m. Upon arriving, she had a brief encounter with Mr. Singh where she inquired whether he was okay to remain in Officer Vanderford's cruiser a little while longer. Mr. Singh replied that he had an anxiety condition and again requested access to his anti-anxiety medication that was at his home. Det. Cpl. Briscoe again asked Mr. Singh if he was okay to "[s]it tight for a little longer[,]" and Mr. Singh replied, "Yes. That's fine."

---

[6] The CRU "investigate[s] all life-threatening and fatal collisions in Montgomery County." In a situation such as this one, priority is given to fire and rescue to render aid and medical treatment, and the CRU typically begins its work once fire and rescue have transported individuals to the hospital.

Other officers on the scene informed Det. Cpl. Briscoe that Mr. Singh displayed "erratic[]" behavior prior to her arrival, but the officers could not specifically attribute this behavior to alcohol. Additionally, Officer Smorse informed Det. Cpl. Briscoe that Mr. Singh's eyes "looked weird[]" but were not bloodshot; Officer Smorse also noted that Mr. Singh was walking oddly when they escorted him to the police cruiser, was not slurring his speech, "took some medication for his high blood pressure" and "just got back from India."[7]

Officer Kimberly Curry, a trained DRE with the Montgomery County Police Department, first made contact with Mr. Singh at 8:51 a.m., having arrived on scene shortly beforehand. Officer Curry opened the door of the police cruiser where Mr. Singh was waiting and immediately smelled an odor she identified as alcohol. Officer Curry provided Mr. Singh his *Miranda* rights[8] and requested that he step out of the vehicle to perform various SFSTs. Officer Curry conducted the horizontal gaze nystagmus test, the walk and turn test, the one-leg stand test, and the lack of convergence test.[9] Mr. Singh demonstrated

---

[7] The suppression hearing record contains moments where certain body camera footage from the various officers was played. The body camera footage capturing the exchange between Det. Cpl. Briscoe and Officer Smorse was marked as Defense Exhibit 1. At one point during the suppression hearing, that video was started at 57:10, and the transcript reflects that Officer Smorse states, "He seems off. You know, he's drunk." Review of the body camera footage reveals that Officer Smorse clearly says, "He seems off. You know, I *don't think* he's drunk." (Emphasis added). Thus, the transcript from the suppression hearing clearly contains a transcription error and incorrectly conveys that Officer Smorse believed Mr. Singh to be under the influence of alcohol.

[8] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[9] The horizontal gaze nystagmus ("HGN") test "has subjects follow a ballpoint pen with their eyes to test eye movement and control." *Motor Vehicle Admin. v. Usan*, 486 Md.

impairment on almost all the tests.[10] Based on his performance on the SFSTs, Officer Curry

formally placed Mr. Singh under arrest at 9:13 a.m. because she believed that he was under

the influence of alcohol and, potentially, a controlled substance. Prior to formally arresting

him, Officer Curry did not display any use of force during her interaction with Mr. Singh.

Law enforcement then transported Mr. Singh to a nearby police station, where he

signed an Advice of Rights Form[11] and agreed to take a breath test for alcohol

concentration. The breath test occurred at 10:15 a.m., approximately three hours after the

accident. Mr. Singh's alcohol concentration at that point was 0.24, which is three times the

legal limit.

## B. *Procedural History*

### 1. The Circuit Court for Montgomery County

In January 2023, the State indicted Mr. Singh on two counts of homicide by motor

---

352, 358 n.1 (2024). The walk and turn ("WAT") test "has subjects walk a straight line in a heel-to-toe fashion to test coordination." *Id.* The one-leg standing ("OLS") test "has subjects stand on one leg to test balance." *Id.* The lack of convergence ("LOC") test includes an officer "tak[ing] a stimulus and . . . mak[ing] circles around [the subject's] face, . . . watching [their] ability to track that stimulus. Then [the officer] come[s] in toward the bridge of [the subject's] nose to see the ability of the eyes to cross or converge."

[10] For the HGN test, Mr. Singh demonstrated the maximum number of possible clues for impairment (6/6). For the WAT test, Mr. Singh was unable to maintain the instructional phase, did not properly follow instructions to walk from heel to toe, and took more than the required nine steps each way. Mr. Singh could not satisfactorily display balance during the OLS test. As for the LOC test, Officer Curry could not recall whether Mr. Singh was able to successfully converge his eyes.

[11] An Advice of Rights Form "is a standardized audio recording or form which advises motorists of their rights regarding alcohol and drug testing pursuant to [Md. Code Ann.,] Transp. § 16-205.1. The recording and form also provide relevant administrative penalties for refusing testing." *Usan*, 486 Md. at 358 n.2.

vehicle while under the influence of alcohol per se, two counts of homicide by motor vehicle while under the influence of alcohol, one count of driving while under the influence of alcohol per se, one count of driving while under the influence of alcohol, one count of driving in excess of a reasonable and prudent speed, one count of failure to exercise due care to avoid a pedestrian collision, and two counts of causing the death of a vulnerable individual while operating a motor vehicle. Mr. Singh filed, among other pre-trial motions, a motion to suppress evidence due to an alleged violation of his Fourth Amendment rights and a motion to exclude the results of the breath test conducted by law enforcement based on the State's alleged non-compliance with CJP § 10-303(a)(2).

As to the Fourth Amendment issue, Mr. Singh argued that his investigatory detention ripened into a de facto arrest unsupported by probable cause when law enforcement "detained him on the scene of the accident for over [two] hours, placed him in the backseat of a 'cage[d]' police car, Mirandized him, and denied his repeated requests for water and essential medications[.]" Mr. Singh argued that, by 8:51 a.m., he was subject to a "full-blown arrest." Because, in Mr. Singh's view, he was the subject of a de facto arrest unsupported by probable cause, he argued that the circuit court was required to suppress all evidence collected after this allegedly unconstitutional arrest, "namely his statements to police, as well as evidence of his breath alcohol content[.]"

At the hearing on this motion, several law enforcement personnel testified about their responses to the scene and interactions with Mr. Singh. The court ultimately denied the motion. In doing so, the court reasoned that, under the totality of the circumstances, law enforcement had reasonable suspicion to believe that Mr. Singh had committed a crime

9

which led to his lawful detention, and that his detention did not transform into a de facto arrest. Specifically, the court considered the seriousness of the potential crime at hand, noting that there were two deceased victims. The court also noted the lack of forceful measures used by law enforcement, indicating that law enforcement's refusal to provide Mr. Singh with water was not a forceful tactic. The length of time of the detention (7:43–8:51), while a factor the court considered, was not, it noted, "the sole consideration." Thus, the court found that Mr. Singh's detention was "supported by reasonable suspicion that he had committed a crime and that he needed to remain on the scene[,]" and that Mr. Singh was not formally arrested until 9:13 a.m. after he completed the SFSTs.

Mr. Singh also filed a motion to exclude the results of his breath test on the ground that the State failed to secure his specimen of breath within two hours of his apprehension, as required by CJP § 10-303(a)(2). Relying on this Court's opinion in *Willis v. State*, 302 Md. 363 (1985), Mr. Singh argued that, as of 7:43 a.m., he was "subjected to the functional equivalent of a stop or detention – and thus apprehended, within the meaning of CJP § 10-303(a)(2)[.]" (Citation modified). Because law enforcement conducted the breath test at 10:15 a.m., he believed that the test occurred outside of the statutorily mandated two-hour window, requiring its suppression.

In opposition to the motion, the State argued that, at the earliest, law enforcement apprehended Mr. Singh, for purposes of CJP § 10-303(a)(2), at 8:51 a.m., as "[n]o officer was able to determine the condition of [Mr. Singh] until the experienced DRE officers were able to accurately determine that [Mr. Singh] was under the influence of alcohol." The State contended that such determination was made at 8:51 a.m. when Officer Curry "noted

10

the odor of alcohol coming from [Mr. Singh]."

After a hearing, the court denied Mr. Singh's motion.[12] The court explained that there was no evidence in the record that law enforcement believed Mr. Singh was under the influence of alcohol or drugs when they detained him at 7:43 a.m. Rather, the court found that law enforcement recognized that "something was strange or off" but that law enforcement otherwise had no indicia that Mr. Singh was under the influence of alcohol. While the court certainly believed that law enforcement had grounds to believe that "some crime[,]" even "a number of crimes[,]" might have been committed, law enforcement did not "necessarily [know what was] going on."

In the circuit court's view, law enforcement did not have the necessary information to apprehend Mr. Singh under CJP § 10-303(a)(2) until 8:51 a.m., when Officer Curry opened the door of Officer Vanderford's car and recognized the smell of alcohol on Mr. Singh. Accordingly, the court denied Mr. Singh's motion because the breath test occurred at 10:15 a.m., well within CJP § 10-303(a)(2)'s two-hour window.[13]

Days after the circuit court resolved the second motion, Mr. Singh waived his right to a jury trial and entered into a not-guilty plea based on an agreed-upon statement of facts, pursuant to Maryland Rule 4-242(a). The court found Mr. Singh guilty on all 10 counts and

---

[12] No live testimony was taken at this hearing. Instead, the judge presiding over Mr. Singh's second motion simply reviewed the transcript of, and findings made at, the earlier hearing for his first motion.

[13] The circuit court made clear that its ruling was "based upon the record that [was] before [it.]" In other words, had Mr. Singh also raised the apprehension issue under CJP § 10-303(a)(2) at the time of his Fourth Amendment challenge, "the record may well have been more robustly developed[.]"

11

sentenced him to five years' imprisonment with all but four years suspended for each count of vehicular homicide while under the influence of alcohol per se, to be served consecutively, as well as a $1,000 fine for each conviction of causing the death of a vulnerable individual while operating a motor vehicle. Upon release, Mr. Singh will be subject to five years of supervised probation. All other convictions merged for purposes of sentencing.

### 2. The Appellate Court of Maryland

Mr. Singh timely noted an appeal with the Appellate Court of Maryland, arguing, among other issues, that the circuit court erred in denying his two motions to suppress. *Singh v. State*, No. 2430, 2025 WL 1732804, at *1 (Md. App. Ct. June 23, 2025).[14]

As to the Fourth Amendment issue, the Appellate Court reasoned that "there was reasonable suspicion that Mr. Singh had committed a serious vehicular offense causing the death of two pedestrians, requiring the police to embark on a potentially complex investigation." *Id.* at *7. These realities, combined with Mr. Singh voicing his desire to leave the scene, and the lack of force used by law enforcement, led the Appellate Court to conclude that, under the totality of the circumstances, Mr. Singh's detention in Officer Vanderford's vehicle did not constitute a de facto arrest. *Id.*

The Appellate Court also rejected Mr. Singh's challenge to suppress the results of

---

[14] Mr. Singh raised an additional issue, asking whether his convictions for homicide by motor vehicle while under the influence of alcohol per se and for death of a vulnerable individual should merge for sentencing purposes. *Singh*, 2025 WL 1732804, at *1, *10. The Appellate Court held that they do not. *Id.* at *10–11. We did not grant review of that issue, so we do not address or discuss that issue further.

12

his breath test under CJP § 10-303(a)(2). *Id.* at \*9. Relying heavily on this Court's opinion in *Willis*, the Appellate Court held that Mr. Singh was apprehended under CJP § 10-303(a)(2), at the earliest, at 8:51 a.m. and that the results of the test were, therefore, admissible. *Id.* at \*8–9.

## III
## STANDARD OF REVIEW

Our review of a "circuit court's denial of a motion to suppress evidence under the Fourth Amendment is limited to information contained in the record of the suppression hearing." *State v. Stone*, 493 Md. 78, 96 (2026) (citing *Sizer v. State*, 456 Md. 350, 362 (2017)). "We view the evidence and inferences that may be drawn therefrom in the light most favorable to the party who prevails on the motion[.]" *Barnes v. State*, 437 Md. 375, 389 (2014) (quoting *Briscoe v. State*, 422 Md. 384, 396 (2011)). "We defer to the suppression court's factual findings and uphold them unless they are shown to be clearly erroneous[,]" acknowledging that the "credibility of the witnesses and the weight to be given to the evidence fall within the province of the suppression court." *Id.* (first citing *State v. Luckett*, 413 Md. 360, 375 n.3 (2010), and then citing *Gonzalez v. State*, 429 Md. 632, 647–48 (2012)). Legal conclusions, however, are reviewed de novo, and we make "our own independent constitutional evaluation as to whether [law enforcement's] encounter with the defendant was lawful[,]" *Stone*, 493 Md. at 96 (quoting *Sizer*, 456 Md. at 362), by applying "the facts under a totality of the circumstances analysis[,]" *id.* (quoting *Sizer*, 456 Md. at 363).

Because CJP § 10-303(a)(2) operates as a statutory "exclusionary rule for

noncompliance[,]" we are guided by the same principles for reviewing the denial of a motion to suppress based on a violation of that statute. *Hasselhoff v. State*, 67 Md. App. 645, 648 (1986); *see also Dejarnette v. State*, 478 Md. 148, 168 (2022) ("[T]he General Assembly knows how to impose, and has imposed, a time requirement related to the admissibility of breath test results—namely, that the breath specimen used for determining alcohol concentration must be taken within two hours after apprehension of the person accused." (citing CJP § 10-303(a)(2))).

**IV**
**ANALYSIS**

Mr. Singh makes two central arguments before this Court. First, he argues that by the time Officer Curry opened the door of the patrol car to conduct SFSTs, his detention had already transformed into a de facto arrest, which was not supported by probable cause, violating his Fourth Amendment rights. Second, Mr. Singh argues that law enforcement "apprehended" him, for purposes of CJP § 10-303, when they placed him in Officer Vanderford's vehicle at 7:43 a.m. Thus, Mr. Singh claims that the breath test, conducted at 10:15 a.m., occurred outside of the statute's two-hour window. Under the totality of the circumstances, we conclude that at no point prior to Mr. Singh's formal arrest did his investigatory detention transform into a de facto arrest unsupported by probable cause. We further hold that Mr. Singh was not apprehended, for purposes of CJP § 10-303, until Officer Curry opened the door of Officer Vanderford's cruiser, smelled an odor of alcohol emanating from Mr. Singh, and responded accordingly by asking Mr. Singh to step out of

14

the vehicle to perform SFSTs. For the reasons discussed below, we affirm Mr. Singh's convictions.

## A.   *Mr. Singh's Investigatory Detention Did Not Convert into a De Facto Arrest*

While law enforcement certainly detained Mr. Singh, he nevertheless was not subjected to an unreasonable detention that violated his rights under the Fourth Amendment. The Fourth Amendment protects against unreasonable searches and seizures. U.S. Const. amend. IV; *United States v. Sharpe*, 470 U.S. 675, 682 (1985) (observing that the Fourth Amendment is not "a guarantee against *all* searches and seizures, but only against *unreasonable* searches and seizures[]"). Evidence seized in violation of the Fourth Amendment generally is excluded. *Terry v. Ohio*, 392 U.S. 1, 13 (1968). The Fourth Amendment, however, is "not implicated in every situation where the police have contact with an individual." *Swift v. State*, 393 Md. 139, 149 (2006) (citations omitted).

"Many courts have analyzed the applicability of the Fourth Amendment in terms of three tiers of interaction between a citizen and the police." *Id.* (citations omitted). These interactions, ranging from least intrusive to most intrusive, are consensual searches and seizures, investigatory detentions (colloquially referred to as a "*Terry* stops"), and arrests. *Id.* at 150. Consensual encounters represent the least intrusive interaction with law enforcement and involve "no restraint of liberty[,]" as they "elicit[] an individual's voluntary cooperation with non-coercive police contact." *Id.* at 151 (citations omitted). "[A] *Terry* stop[] is less intrusive than a formal custodial arrest and must be supported by reasonable suspicion that a person has committed or is about to commit a crime and permits an officer to stop and briefly detain an individual." *Id.* at 150 (citations omitted). An arrest

15

is the most intrusive type of police encounter and "requires probable cause to believe that a person has committed or is committing a crime." *Id.* (citations omitted).

While the different types of police encounters have distinct features and, depending on the type of encounter, certain prerequisites before they can be deemed constitutionally legitimate, they do not exist in isolation. What may start as a consensual encounter with police quickly can morph into a nonconsensual encounter whereby an individual is prevented from leaving. *See id.* at 152 (noting that police encounters are "fluid" situations and that the nature of an encounter can change as time progresses). At all times during a police encounter, it is incumbent on the police to ensure that they possess either reasonable suspicion or probable cause to elevate a consensual encounter into either an investigatory detention or an arrest, respectively. The same holds true in elevating an investigatory detention to an arrest. *See Barnes*, 437 Md. at 390 (noting that, after a valid stop based on reasonable suspicion occurs, an officer can elevate that investigatory stop to an arrest only where "the officer's suspicion ripens into probable cause"). Because the nature of the encounter can be fluid, courts must analyze the totality of the circumstances surrounding the encounter to determine its classification and, thus, the State's burden, if any, to legally justify that encounter. *Id.* at 391; *In re David S.*, 367 Md. 523, 535 (2002).

An investigatory detention, if challenged, is valid if it satisfies a "dual inquiry[.]" *Sharpe*, 470 U.S. at 682. The first step requires assessing whether "the officer's action was justified at its inception," i.e., whether the police had an "articulable and reasonable suspicion" that an individual was, or was about to be, engaged in criminal activity to justify stopping the individual in the first place. *Id.* Under the second step, a court evaluates

16

whether the detention itself is "reasonably related in scope to the circumstances which justified the interference in the first place." *Id.*; *see also In re David S.*, 367 Md. at 533 (noting that, in addition to being "justified at its inception," a reasonable investigatory detention must be "reasonably related in scope to the circumstances which justified the interference in the first place[]" (quoting *Terry*, 392 U.S. at 20)).

A defendant can challenge a *Terry* stop on one or both prongs, and defendants often challenge both prongs. *See, e.g.*, *In re David S.*, 367 Md. at 534–40. Mr. Singh does not challenge the constitutionality of his investigative detention under *Terry*'s first prong. Rather, the parties agree that the State had reasonable suspicion to conduct an investigatory detention of Mr. Singh and prevent him from leaving the scene. Thus, we focus our analysis on assessing the reasonableness of Mr. Singh's investigatory detention. That analysis "requires balancing 'the nature and quality of the intrusion on personal security against the importance of the governmental interests alleged to justify the intrusion.'" *Id.* at 533 (quoting *United States v. Hensley*, 469 U.S. 221, 228 (1985)). We now turn to that balancing test.

### 1. Nature of the intrusion

In Mr. Singh's view, under the totality of the circumstances, his detention "can only be characterized as substantial." His argument can be broken down by focusing on two aspects of his detention: police tactics and length. As to police tactics, Mr. Singh focuses on several aspects. First, he argues that his "placement in the back of the patrol car was not voluntary[]" and that he simply was "told" that he would be placed in the cruiser. That placement, he argues, "significantly restricted his movement and removed him from public

17

view." Second, Mr. Singh highlights that there was a physical barrier within the police cruiser itself, separating those in the front from the back, and that the rear doors had no interior handles to operate the windows or doors. Mr. Singh also notes that the car windows were tinted and "appeared to have bars on them[.]" Third, Mr. Singh directly challenges the factual finding made by the circuit court that the officers did not use forceful police tactics against him.

As to length, Mr. Singh argues that his detention was "much longer" than detainees have been subject to in previous cases before this Court. And he believes that law enforcement was not diligently pursuing an investigation during his detention, arguing that there is "no evidence" explaining (1) Det. Cpl. Briscoe's actions from the time of her arrival until Officer Curry began the SFSTs or (2) "what, if anything, Officer Curry might have been doing before 8:51 a.m."

Accordingly, Mr. Singh believes that, "[g]iven the involuntary nature of the restraint, the significant nature of the intrusion, and the length of the detention," his detention was, in fact, a de facto arrest, requiring probable cause.

## 2. The governmental interests alleged

The State argues that when law enforcement arrived on scene, "they had reasonable suspicion for an investigative detention of Mr. Singh[,]" as he was the apparent driver of a vehicle that "had just struck and gravely injured two pedestrians." The State contends that Mr. Singh was a flight risk, and that it was "not practical to keep [him] in his vehicle" while CRU conducted its investigation because "CRU needed complete control of the scene and

18

removing Mr. Singh from the area of this detailed investigation was reasonable."[15] Last,

the State asserts that we should not overlook the "complexity and severity of the accident"

and that police were working diligently to conduct their investigation during the entire time

that Mr. Singh was detained.

### 3. Balancing the nature of the intrusion against the governmental interests

Under the totality of the circumstances, we hold that Mr. Singh's detention did not

convert into a de facto arrest in violation of the Fourth Amendment. We have stated that

"an arrest is the taking, seizing[,] or detaining of the person of another, *inter alia*, by any

act that indicates an intention to take [them] into custody and that subjects [them] to the

---

[15] Mr. Singh argues that this governmental interest is not properly before us because the State leverages statements and information contained within the agreed-upon statement of facts for his not-guilty plea and from portions of body-worn camera footage not played during the suppression hearing. We agree with Mr. Singh that we cannot consider facts stipulated to during his trial. *See Carter v. State*, 367 Md. 447, 457 (2002) ("Our review of a circuit court's denial of a motion to suppress evidence, ordinarily, is limited to the evidence presented at the suppression hearing. Thus, we refrain from engaging in *de novo* fact-finding and looking at the trial record for supplemental information." (citations omitted)). And we do not do so throughout this opinion when discussing Mr. Singh's detention and the events leading up to it.

Regarding Mr. Singh's second point, the record reflects that the circuit court here immediately ruled from the bench on Mr. Singh's motion to suppress, so we know that the court reviewed only the portions of the body-worn camera footage that were played for it during the suppression hearing. Nevertheless, we do not agree with Mr. Singh that those exhibits—in full—are off limit on appeal. When evaluating a motion to suppress, an appellate court is cabined to the *suppression record*, not merely the discrete pieces of evidence we can be absolutely certain that the circuit court considered or mentioned during an oral or written ruling. Mr. Singh has cited no case, and we can find none, that stands for the proposition that "suppression record" has a definition that is something narrower than *all* the evidence admitted at the suppression hearing. Be that as it may, we choose to cabin our analysis in this case to the portions of the body-worn camera footage that were played for the circuit court because those excerpts, along with the relevant testimony and inferences drawn in the State's favor, are enough to affirm the circuit court's ruling.

19

actual control and will of the person making the arrest." *Morton v. State*, 284 Md. 526, 530 (1979). "[F]our elements must ordinarily coalesce to constitute a legal arrest: (1) an intent to arrest; (2) under a real or pretended authority; (3) accompanied by a seizure or detention of the person; and (4) which is understood by the person arrested[.]" *Longshore v. State*, 399 Md. 486, 502 (2007) (quoting *Bouldin v. State*, 276 Md. 511, 516 (1976)). Still, "there are no *per se* rules or bright lines to determine when an investigatory stop" exceeds the bounds of reasonableness and becomes an arrest that requires probable cause. *In re David S.*, 367 Md. at 534. But the mere seizure of a person is not "elevated automatically into an arrest" simply because law enforcement deployed measures like those commonly seen in a formal arrest, such as the drawing and pointing of a service weapon or the use of handcuffs. *Id.* at 535 (citations omitted). Again, we are guided by the totality of the circumstances—not the mere appearance of isolated police tactics. Our case law helps illustrate this point. Because Mr. Singh argues that *Lee v. State*, 311 Md. 642 (1988), *In re David S.*, and *Longshore* "provide the framework that should be used to resolve [his] case[,]" we begin with a discussion of those cases.

In *Lee*, we held that, despite officers' "hard take down" of the defendant, the defendant's seizure was not a de facto arrest based on the totality of the circumstances. 311 Md. at 661–62, 666–67. There, police were informed by an unknown individual that the defendant was one of the parties responsible for a prior unsolved robbery, would be at a local tennis court to purchase drugs, and would be carrying a small blue bag containing a firearm. *Id.* at 648–49. The defendant also matched the description of at least one of the perpetrators that the victim provided. *Id.*

20

A few moments after arriving at the tennis court and conducting surveillance, six police officers, at least two of whom were armed with shotguns, descended upon the defendant and others on the court from three different directions, identifying themselves as police and ordering everyone on the court to lie face down on the ground. *Id.* at 651. When the officers reached the court, five men were lying down, all of whom police patted down. *Id.* One officer searched a nearby blue bag that matched the informant's description, and the officer located a firearm. *Id.* at 651–52. The defendant unsuccessfully moved to suppress the firearm. *Id.* at 652.

In assessing whether the defendant's seizure under *Terry* was reasonable,[16] it was clear that the intrusion into the defendant's liberty was "substantial[:]" he was "ordered to lie on the ground and weapons, including shotguns, were pointed at [him]." *Id.* at 661. But the length of the detention itself was minor, lasting only two minutes, and the State had a legitimate interest in crime prevention and protecting the public from an at-large individual suspected of armed robbery and attempted murder. *Id.* In carrying out those legitimate interests, the police were not, we noted, required to turn a blind eye to their own safety; rather, they could consider protecting themselves, as well as the other individuals on the tennis court. *Id.* at 661–62. Because a slowly approaching officer could have "alarmed" one of the individuals present on the court, *id.* at 662, and because individuals (including the defendant) easily could have reached the bag with the firearm with a clear line of fire

---

[16] The defendant argued that police did not have reasonable suspicion to seize him in the first instance, but we rejected that claim. *Lee*, 311 Md. at 653–61.

21

to approaching officers, *id.* at 666–67, we held that it was reasonable when the police exhibited "a show of force to control the situation and minimize the risks[,]" *id.* at 662.

Similarly, in *In re David S.*, we held that no de facto arrest occurred where police officers, believing that the defendant had just received a firearm from a third party, drew their service weapons on the defendant, forced him onto the ground, handcuffed him, and searched him, ultimately finding cocaine instead of a firearm. 367 Md. at 530, 539–40. After concluding that the officers had reasonable suspicion to conduct the *Terry* stop, *id.* at 534–35, we further held that the investigatory stop was not "tantamount to an arrest[]" because the officers' conduct, even though considered to be a "hard take down," "was not unreasonable" given that the officers "reasonably could have suspected that [the defendant] posed a threat to their safety." *Id.* at 539. Under the totality of the circumstances, although we noted, as we did in *Lee*, that the intrusion into the defendant's security was severe, it was reasonable "and did not convert the investigatory stop into an arrest under the Fourth Amendment." *Id.* at 539–40.

In *Longshore*, we concluded that a de facto arrest had occurred when the defendant, whom officers believed to be in possession of drugs, was pulled over while driving and placed in handcuffs while law enforcement waited for a K-9 officer to arrive. 399 Md. at 495–96, 514. There, law enforcement began surveilling the defendant based on a tip from an informant who had videotaped the defendant and two others purportedly engaging in a drug transaction in a mall parking lot. *Id.* at 494–95. During their own surveillance, police witnessed the defendant meet with the same other two individuals depicted in the informant's videotape. *Id.* at 495.

After the three parted ways, the defendant entered the mall, and police brought a drug-detecting dog to scan the defendant's vehicle, but the dog did not alert to the presence of any narcotics. *Id.* After the defendant returned to his vehicle and left, police stopped the defendant and informed him that they believed that he was in possession of illegal drugs, but the defendant refused to consent to a search of his vehicle. *Id.* Despite the prior negative result, officers requested a K-9 officer and handcuffed the defendant while they waited. *Id.* at 495–96. The same K-9 unit used in the initial dog sniff arrived shortly thereafter and alerted law enforcement to the presence of drugs, and police eventually discovered crack cocaine in the center console of the vehicle. *Id.* at 496.

In concluding that handcuffing the defendant resulted in his arrest, we stated "that *no special circumstances existed* that justified the police officers placing him in handcuffs." *Id.* at 514. We further explained that "there was no suspicion that a violent crime had occurred, nor any reason to believe that [the defendant] was armed or dangerous[]" and that there "was no reason to believe that [the defendant] was a flight risk." *Id.* Because the defendant was neither a flight nor safety risk, we held that the use of handcuffs was unreasonable, elevating his detention into an unlawful arrest. *Id.* at 515.

As to the length of an investigatory detention, two cases are instructive: *Sharpe* and *Barnes*. In *Sharpe*, the Supreme Court of the United States held that a 20-minute detention of a driver to confirm or dispel suspicions of the transportation of drugs was reasonable. 470 U.S. at 683. There, two vehicles, a pickup truck and a sedan, appeared to be traveling together, and the pickup truck appeared "heavily loaded" and otherwise drove in a suspicious manner. *Id.* at 677. Drug Enforcement Administration Agent Cooke and Officer

Thrasher eventually attempted to pull over both vehicles; Sharpe, the driver of the sedan, complied, but the driver of the pickup truck, Savage, continued driving with Officer Thrasher in pursuit. *Id.* at 677–78. During his stop of Sharpe, Agent Cooke radioed Officer Thrasher to inquire whether he successfully stopped the pickup truck. Having received no response, Agent Cooke requested back up, which arrived 10 minutes later, to stay with Sharpe while he drove to Officer Thrasher's location. *Id.* at 678. Agent Cooke arrived 15 minutes later and, upon searching the pickup truck, discovered that it contained a large amount of marijuana. *Id.* at 679.

In assessing the duration of Savage's detention, the Supreme Court considered it "appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *Id.* at 686. The Court noted that, in answering that question, it is appropriate "to consider whether the police are acting in a swiftly developing situation[]" but cautioned courts not to "indulge in unrealistic second-guessing[]" because "[a] creative judge engaged in *post hoc* evaluation of police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished." *Id.* at 686–87 (citation omitted). The proper inquiry is not, the Court noted, whether less intrusive means to the action taken by the police existed; rather, the proper inquiry is "whether the police acted unreasonably in failing to recognize or to pursue it." *Id.* at 687. Because Savage's 20-minute detention consisted of law enforcement diligently coordinating with each other so that Agent Cooke could join Officer Thrasher and then

24

quickly confirm suspicions that Savage was trafficking narcotics, the length of the detention was reasonable. *Id.*

In *Barnes*, we held that an investigatory detention spanning almost four and one-half hours was reasonable under the totality of the circumstances and did not convert the stop into a de facto arrest. 437 Md. at 383–84, 398–99. There, law enforcement procured a warrant to obtain the defendant's DNA and fingerprints as a part of their investigation into a double homicide. *Id.* at 382–83. Police stopped the defendant at 6:40 p.m., handcuffed him, placed him in the front seat of a police cruiser, and escorted him to a police station so that they could collect his DNA. *Id.* at 383. Police did not collect the defendant's DNA until 10:15 p.m., over three hours after his detention began. *Id.* at 384. At 11:00 p.m., seven minutes after the police finished executing the DNA warrant, the defendant gave police permission to search his storage locker, and the search led to the discovery of incriminating evidence, which the State used to subsequently charge the defendant with conspiracy to commit murder. *Id.* at 384–85.

On appeal from the denial of the defendant's motion to suppress the evidence found in the storage locker, the defendant asserted two grounds that, in his estimation, converted his investigatory stop into a de facto arrest that lacked probable cause: (1) unreasonably delaying the execution of the DNA warrant after police initiated the investigatory detention, *id.* at 393, and (2) continuing to detain him *after* execution of the DNA warrant, *id.* at 394–95. We rejected both arguments. Regarding the first, we noted that courts, under the Fourth Amendment, are not in the business of second-guessing law enforcement by asking whether "the officers accomplished their goal in the least intrusive manner;" rather,

25

the relevant inquiry is reasonableness within the meaning of the Fourth Amendment. *Id.* at 393 (citation modified). Thus, the proper inquiry was not whether the police *could have* executed the DNA warrant sooner, but rather to ascertain the "reasonableness of the delay." *Id.* at 394. The suppression testimony revealed that no officer was available to take DNA samples and fingerprints from the defendant at an earlier time because police were both searching the home of a victim's spouse and questioning her until 9:30 p.m. *Id.* Given that police were investigating the crime and not sitting idly by, we held that the approximately three-hour delay in executing the DNA warrant did not violate the Fourth Amendment. *Id.*

Because we held that the defendant's detention was reasonable from the moment he was stopped by police (6:30 p.m.) to the moment the search warrant was executed (10:15 p.m.), we then focused our analysis on the post-execution detention period, which began at 10:53 p.m. *Id.* at 383–84, 395–96. A mere seven minutes had elapsed between law enforcement returning the defendant to the interview room and the defendant consenting to the search of his storage locker. *Id.* at 397. That investigatory detention, "a few minutes at the police station in the same room [the defendant] had been detained lawfully in order to execute a judicially authorized warrant for his DNA and fingerprints[,]" did not rise to the level of a de facto arrest. *Id.* at 397.

Turning back to Mr. Singh's investigatory detention, in our view, under the totality of the circumstances, his investigatory detention was reasonable. When Officer Smorse arrived on scene, he immediately was confronted with two seriously injured—at that point possibly deceased—victims and an individual standing by a car with a caved in windshield, whom Officer Smorse reasonably concluded had struck those two victims. Shortly after

26

Officer Smorse's arrival, that same individual, Mr. Singh, asked if he was free to leave. Officer Smorse noted that something about Mr. Singh was off but could not pinpoint what. Possessing reasonable suspicion that Mr. Singh had committed various crimes, Officer Smorse told Mr. Singh that he was not free to leave, initiating an investigative detention. Shortly after, the decision was made to move Mr. Singh a short distance from the scene into a police cruiser so that law enforcement could conduct its investigation without interference and so that Mr. Singh could avoid witnessing the unfortunate scene.

The investigation that ensued swiftly developed. For example, Det. Cpl. Briscoe was notified about the accident and summoned to the scene roughly five minutes after Officer Smorse arrived on scene—and before Mr. Singh was ever placed in Officer Vanderford's vehicle. While en route, Det. Cpl. Briscoe learned of her colleagues' observations and opinions about Mr. Singh prompting her to request, per Montgomery County Police Department protocol, that a DRE respond to the scene. Det. Cpl. Briscoe arrived on scene in slightly under 45 minutes. Upon her arrival, she immediately communicated with Mr. Singh. Officer Curry, the trained DRE who responded to Det. Cpl. Briscoe's request, arrived on scene around 8:41 a.m., meaning that, at most, it took her roughly one hour and 10 minutes to arrive. From the time Officer Curry arrived, to the moment she first made contact with Mr. Singh, an additional 10 minutes elapsed.

Although there was no direct testimony at the suppression hearing that officers moved Mr. Singh to Officer Vanderford's cruiser specifically so that they could conduct their investigation unobstructed by Mr. Singh, the evidence we have recounted—when viewed in the light most favorable to the State—certainly permits drawing that reasonable

27

inference. *See Barnes*, 437 Md. at 389. It is a reasonable inference that, during an active investigation at a potential crime scene, law enforcement would want to remove an individual (possibly a criminal defendant at that point) so that it can preserve evidence and conduct its investigation unobstructed. The same can be said for Mr. Singh's status as a flight risk. Although no officer testified as such at the suppression hearing, the facts—when viewed in the light most favorable to the State—lead us to conclude that placing Mr. Singh in Officer Vanderford's cruiser was also legitimate for this purpose. Shortly after Mr. Singh struck and fatally injured two people, he asked if he was free to leave and for his license back. That, in and of itself, is odd behavior under these circumstances. But law enforcement, as we have discussed, further testified that Mr. Singh was exhibiting odd behavior generally. Given this, it was reasonable for the State to characterize Mr. Singh as a flight risk and move him to a controlled environment, eliminating his risk of flight.[17]

Mr. Singh remained in the police cruiser for slightly more than one hour. At no point did law enforcement forcefully put their hands on him, draw their service weapons and aim at him, place him in handcuffs, threaten him, or use any other forceful tactics against him. In other words, law enforcement did not use any of the hallmarks traditionally associated

---

[17] Mr. Singh argues that there was "absolutely no evidence in the record that [he] was a flight risk." To support that argument, he notes that he never left the immediate vicinity of his car, would have been unable to drive away, and could not have fled the scene, due to "his physical condition and attire[.]" We are unpersuaded. Mr. Singh conflates the low likelihood of successful flight with law enforcement's reasonable belief that such flight could occur. The question is not, "If this defendant were to attempt to flee, how *successful* would they be?" The question is "How likely is it that this particular individual *will attempt* to flee?" Mr. Singh effectively asks us to view the record in the light most favorable to *him* and draw reasonable inferences in *his* favor. Our standard of review requires us to reject that invitation. *See Barnes*, 437 Md. at 389.

28

with an arrest. *See In re David S.*, 367 Md. at 535 (recognizing the drawing and pointing of firearms and use of handcuffs as indicia of an arrest); *Longshore*, 399 Md. at 509 (discussing use of handcuffs). Nor is there any evidence in the record that demonstrates that law enforcement had ever intended to arrest Mr. Singh prior to Officer Curry's formal arrest. *See Longshore*, 399 Md. at 502 (noting the four elements that usually must be present for an arrest to have occurred, including an intent to arrest).[18] And while Mr. Singh was detained for slightly more than one hour, the record shows that law enforcement

---

[18] On intent to arrest, Mr. Singh argues that "police clearly believed that [he] had effectively been arrested by 8:51 a.m." because (1) Officer Curry Mirandized him "even though she did not typically do that before performing a DUI evaluation[]" and (2) Officer Smorse "searched [his] car, an act which would have been constitutional only if it w[ere] a search incident to arrest or a search for evidence of a crime, both of which would have required probable cause[.]" (Citation omitted). Neither argument has merit.

*Miranda* "dictates that when a suspect is taken into custody, the person is entitled to certain procedural safeguards before law enforcement officers may interrogate that person." *Blake v. State*, 381 Md. 218, 231 (2004). Although these are procedural safeguards enjoyed by those in custody, whether an individual is or is not Mirandized is not dipositive of whether they have been arrested. Police very well could Mirandize someone out of an abundance of caution even though they have no intention of arresting the individual. That appears to be the case here. Officer Curry testified that she ordinarily Mirandizes individuals before conducting drug testing but not necessarily before conducting SFSTs. Officer Curry explained that, in a typical drug evaluation case, the suspect has "already been arrested and in custody at that time." In this case, Officer Curry "wasn't sure what had happened before [she had] gotten on scene. So [she] just felt it was safe -- better safe than sorry[]" to Mirandize Mr. Singh. In choosing to Mirandize Mr. Singh, the record reveals that Officer Curry was erring on the side of caution and not intending to arrest him.

Officer Smorse's brief search of Mr. Singh's car also fails to show that a de facto arrest occurred. Officer Smorse's search was done for the purpose of locating any "pill bottles" in the car. The transcript of the suppression hearing that plays this same portion of the body-worn camera footage mistakenly transcribes Officer Smorse as stating that he was searching for "alcohol bottles" in the car; Officer Smorse made no such statement. The record indicates that Officer Smorse was looking for Mr. Singh's prescription medication, not necessarily in search of evidence that Mr. Singh committed a crime. Drawing reasonable inferences in the State's favor, the conduct here fails to indicate that Officer Smorse believed Mr. Singh was under arrest at the time.

29

diligently was pursuing an investigation that required specialty officers—both members from the CRU and a DRE. *See Barnes*, 437 Md. at 393–94. Under the totality of the circumstances, all of this was reasonable.

We reject Mr. Singh's argument that the intrusion into his liberty was severe based on law enforcement's actions or the length of his detention. To start, Mr. Singh argues that, because the use of handcuffs is a show of force in the de facto arrest analysis, "[p]lacing [him] in the backseat of a police car with the door shut [is] no less of a use of force than placing him in handcuffs[.]" As Mr. Singh sees it, placing him in the cruiser was "a way for police to exert their authority over [him]; it was intended to, and did, immobilize him; and it is the type of action traditionally associated with arresting someone." (Citing *Barnes*, 437 Md. at 391). Mr. Singh, relying on our opinion in *Morton*, goes so far as to suggest that we have explicitly recognized that "placing someone in a patrol car is tantamount to an arrest." Not so.

*Morton* contains no explicit statement that—in all cases—placing an individual in a police cruiser automatically qualifies as an arrest. Even if we had made such a sweeping statement then, it would have been abrogated by our more recent recognition that "there are no *per se* rules or bright lines to determine when an investigatory stop and frisk becomes an arrest[.]" *In re David S.*, 367 Md. at 534.[19] Additionally, as a practical matter, placing

---

[19] Mr. Singh's reading of *Morton* also elides the facts of that case. There, the day after a robbery, police stopped and frisked the defendant. 284 Md. at 528. Finding nothing, police allowed the defendant to leave but kept him under surveillance. *Id.* That same officer received word that the defendant "may have been wanted" without further information concerning why or on what basis. *Id.* The officer confronted the defendant inside a recreational center, informed the defendant that he may be wanted, told the defendant to

an individual into a police cruiser, while perhaps advancing the objectives of officer safety and preventing flight, is not limited to those objectives. Indeed, there are myriad reasons why law enforcement might place an individual into a police cruiser, a few of which are to physically protect the individual, prevent the individual from having to witness traumatic scenes, protect other members of the public, and remove the individual from a potential crime scene to permit investigation and preservation of evidence. We, therefore, reject Mr. Singh's contention that his placement in a police cruiser, as a matter of law, is a show of police force and, even if it were a show of force, that it automatically elevates a detention into a de facto arrest. Contrary to his assertion, placing an individual into a police cruiser is not synonymous with the use of handcuffs. *See id.* ("[T]here are no *per se* rules or bright lines to determine when an investigatory stop and frisk becomes an arrest and is elevated to the point that probable cause is required." (citation omitted)); *see also United States v. Parr*, 843 F.2d 1228, 1230 (9th Cir. 1988) ("Certainly, there is no per se rule that detention

accompany him, and instructed the defendant to bring his possessions, including a black leather jacket and plastic bag that the officer saw during their first encounter. *Id.* The defendant informed the officer that those items were with the defendant's cousin, so the officer placed the defendant inside his cruiser to search the recreational center. *Id.* The officer eventually found those items, searched them, and found a firearm and marijuana. *Id.* at 528–29. Upon returning to his cruiser, the officer placed the defendant under arrest.

We held that the defendant was clearly placed under arrest when he was escorted to the police cruiser and placed inside it. *Id.* at 530. Critically, we noted that the record was void of any "lawful basis for the warrantless arrest" and that the officer "had unparticularized information giving rise to a suspicion that [the defendant] was guilty of an unspecified crime." *Id.* at 530–31. Because the arrest was "patently illegal," the seizure of the defendant's items likewise was illegal. *Id.* at 531. Nowhere in *Morton* did we state that placing an individual into a police cruiser is tantamount to arrest in all cases. Rather, we held that physically restraining an individual—without even so much as reasonable suspicion—amounted to an unlawful arrest. Mr. Singh's reading of *Morton* is, therefore, incorrect, and we reject it.

31

in a patrol car constitutes an arrest." (citing *United States v. Kapperman*, 764 F.2d 786, 792 (11th Cir. 1985))); *United States v. Manbeck*, 744 F.2d 360, 377 (4th Cir. 1984) ("This court refuses to recognize a rule that all detentions in a patrol car are *per se* arrests."); *United States v. Rodriguez*, 831 F.2d 162, 166 (7th Cir. 1987) ("Considering the particular circumstances under which the stop had to be made here, sitting in the patrol car for several minutes was merely a normal part of traffic police procedure for identifying delinquent drivers. The steps taken did not connote an intent to take [the defendant] into custody and do not seem to have gone beyond their ostensible purpose—to establish identification."); *Kapperman*, 764 F.2d at 792 (rejecting the argument that "moving the investigation or requiring [the defendant] to ride in the patrol car to a nearby place where the search would be conducted converted a lawful investigatory stop into an arrest[]").

While placement into a police cruiser *can be a* show of police force, whether it is a show of force in a given case and, more specifically, whether it is an *unreasonable* show of force in that case must be analyzed under the totality of the circumstances. *See Longshore*, 399 Md. at 518 ("[T]he facts of each case are different resulting in there never being one particular factor that is dispositive . . . ."). We, thus, reject Mr. Singh's argument that placement into a cruiser *always* is a show of force that can *only* be justified either for officer safety or to prevent flight.[20]

---

[20] Mr. Singh argues that we have "explicitly included 'placing the suspect in the back of police cruisers' in [our] list of acts that constitute force." (Quoting *Longshore*, 399 Md. at 509). The passage Mr. Singh quotes, however, was our summary of the *Appellate Court's* overview of police actions that constitute a use of force. *Longshore*, 399 Md. at 509. Nowhere in *our opinion* in that case did we state that placing an individual in a police cruiser always will be a show of police force and, if so intended, automatically elevates an

We further reject Mr. Singh's argument that his placement in Officer Vanderford's cruiser was essentially involuntary and that the cruiser's features and law enforcement's decision to deny him water all represent forceful police tactics. Here, the circuit court specifically found that law enforcement had not engaged in any "forceful measures . . . during [Mr. Singh's] period of detention[,]" specifically noting that law enforcement's decision to deny him water did "not amount to a -- forceful measure[.]" These are findings of fact for which the circuit court is owed deference absent clear error. *See Longshore*, 399 Md. at 498 ("[A]n appellate court will give great deference to a hearing judge's determination and weighing of first-level findings of fact. It will not disturb either the determinations or the weight given to them, unless they are shown to be clearly erroneous."

---

investigative detention into an arrest. The issue in *Longshore*, as discussed above, was whether the defendant's *placement in handcuffs* constituted an unreasonable show of force in that case, and we held that it was. 399 Md. at 495–96, 515. *Longshore* otherwise did not involve placement of a defendant into a police cruiser.

Mr. Singh also relies on two cases from the New Mexico Court of Appeals to help illustrate "what distinguishes a reasonable detention from a de facto arrest when police choose to detain a suspect in a patrol car[:]" *State v. Buecker*, 548 P.3d 447 (N.M. Ct. App. 2023), and *State v. Ortiz*, 400 P.3d 312 (N.M. Ct. App. 2017). But these cases do little to advance Mr. Singh's arguments. In both cases, the New Mexico Court of Appeals did no more than what we do here: weigh, under the totality of the circumstances, the intrusion into an individual's privacy against the governmental interest alleged to have justified the intrusion. *See Buecker*, 548 P.3d at 455 ("Although the intrusion upon [the d]efendant's privacy rights was considerable, we cannot say that it outweighed the government's substantial justification for the intrusion, considering the offenses being investigated and the potential danger faced by officers. All in all, under the particular factual circumstances of this case[,] . . . we affirm the district court's determinations that [the d]efendant's detention was reasonable and [that] he was not subjected to an unlawful de facto arrest." (citations omitted)); *Ortiz*, 400 P.3d at 320 ("As this case proves, an officer's diligence and ability to confirm or dispel [their] suspicions in a short amount of time may be insufficient to overcome the intrusions upon a defendant's privacy interest where such intrusions result in a highly-restrictive detention and are not supported by reasonable justification.").

(citations omitted)). The circuit court found that Mr. Singh's detention was reasonable based, in part, on the fact that two dead bodies were present and given Mr. Singh's behavior. And the record otherwise provides evidence that Mr. Singh was placed in Officer Vanderford's cruiser for legitimate police objectives. Thus, Mr. Singh has not demonstrated that the circuit court committed clear error when it found that the police did not utilize any forceful tactics, and his arguments simply do not reflect the facts before us.[21]

We also are not persuaded that the length of Mr. Singh's detention crept into the realm of unreasonableness under the totality of the circumstances. To reiterate, Mr. Singh takes issue with law enforcement's diligence in investigating, arguing that "there is scant evidence in the record as to what police were doing during that time[.]" The record reveals otherwise, and case law requires us to reject Mr. Singh's argument.

Contrary to Mr. Singh's allegation, the record does not suggest that law enforcement conducted their investigation in a less-than-diligent manner or that they responded unreasonably to the chaotic situation they encountered. The record demonstrates the opposite. Law enforcement swiftly responded to a collision that involved the tragic loss of

---

[21] As a practical matter, we find the merits of Mr. Singh's arguments unpersuasive. Regarding voluntariness, the record does not disclose that Mr. Singh exhibited any unwillingness to sit in the cruiser. Once in the cruiser, he never asked if he could exit the vehicle; instead, he communicated to Det. Cpl. Briscoe that he was "fine" to stay there a little while longer. Additionally, police cruisers typically will bear the features that Mr. Singh encountered here: a bifurcating cage between the front and back halves of the cruiser, an inability for those in the back to operate the doors or windows, and tinted windows. In the circumstances presented here, these standard features of a police cruiser do not alter the analysis of whether law enforcement's decision to place Mr. Singh in the back of Officer Vanderford's cruiser was a show of force.

two lives and occurred in a busy public venue, specifically in front of a school functioning as a polling place on election day.

Minutes after the accident, Det. Cpl. Briscoe immediately made her way to the scene and began making calls to locate a qualified DRE. Det. Cpl. Briscoe's actions aligned with departmental policies for fatal collisions, which require use of a DRE, regardless of law enforcement's suspicion of the reason for possible impairment. Det. Cpl. Briscoe eventually contacted Officer Curry, who made initial contact with Mr. Singh at approximately 8:51 a.m. And the record reveals that, at most, it took Officer Curry roughly one hour to arrive on scene from the time Det. Cpl. Briscoe requested a DRE.

Mr. Singh points to no evidence that either refutes Det. Cpl. Briscoe's and Officer Curry's testimony or suggests that law enforcement acted in a less-than-diligent manner. Rather, Mr. Singh's argument misapprehends a court's role in assessing law enforcement's actions at this stage. As we explained in *Barnes*, our role is not to second guess law enforcement's decisions during their investigation, especially during "swiftly developing . . . investigation[s]." 437 Md. at 394 (citation omitted). A motor vehicle accident involving loss of life is paradigmatic of a swiftly developing investigation. Mr. Singh would have us engage in the exact type of judicial oversight of police investigation that we previously have rejected. Such a practice would easily invite judges to "engage[] in post hoc evaluation of police conduct[,]" for which there will almost always be some alternative means by which law enforcement's objective "might have been accomplished[.]" *Id.* (quoting *Sharpe*, 470 U.S. at 686–87). Rather, we simply must ask whether law enforcement's actions—delayed or not—are reasonable under the circumstances. *Id.* at

35

393. As we have discussed, nothing in this record suggests that law enforcement acted unreasonably or in a dilatory manner while Mr. Singh remained in Officer Vanderford's cruiser. To the contrary, as Det. Cpl. Briscoe explained, if anything, law enforcement responded to the fatal collision here in a "medium to fast" manner. Under the totality of the circumstances, the length of Mr. Singh's detention, which lasted a little over one hour, was reasonable. *See id.* at 393–94; *see also Sharpe*, 470 U.S. at 686.

We, therefore, reject Mr. Singh's arguments that either the nature or length of his lawful investigative detention was unreasonable and affirm the denial of his motion to suppress based on his alleged Fourth Amendment violation.

## B.    *The State Complied with CJP § 10-303(a)(2)*

For this issue, Mr. Singh argues that law enforcement apprehended him under CJP § 10-303 when he was placed in Officer Vanderford's vehicle at 7:43 a.m. Thus, Mr. Singh argues that the breath test taken at 10:15 a.m. falls outside of § 10-303(a)(2)'s two-hour window, requiring suppression of the test results. The State argues that law enforcement did not apprehend Mr. Singh for purposes of the statute until 8:51 a.m. when Officer Curry noticed the smell of alcohol on Mr. Singh's person and initiated SFSTs. We agree with the State.

CJP § 10-303(a) reads:

(a)(1) A specimen of breath or 1 specimen of blood may be taken for the purpose of a test for determining alcohol concentration.

(2) For the purpose of a test for determining alcohol concentration, the specimen of breath or blood shall be taken within 2 hours after the person accused is apprehended.

36

The statute does not define the word "apprehended," but we previously interpreted that word in *Willis*. There, we held that an apprehension under CJP § 10-303(a)(2) occurs when a police officer (1) "has reasonable grounds to believe that the person is or has been driving a motor vehicle while intoxicated or while under the influence of alcohol" *and* (2) "reasonably acts upon that information by stopping or detaining the person." *Willis*, 302 Md. at 376.

In *Willis*, the defendant ran a red light and struck another vehicle shortly after 1:00 a.m. *Id.* at 366. An officer arrived at the scene within minutes, confirmed that the defendant and her passengers were not seriously injured, and turned his attention to the other vehicle. *Id.* The officer observed that the passenger in the other vehicle was deceased while its driver was severely injured. *Id.* By 1:15 a.m., first responders arrived and began tending to the occupants of that vehicle, so the officer began interacting with the defendant, who he quickly realized was confused, disoriented, and smelled of alcohol. *Id.* The defendant told the officer that she had been drinking but did not disclose how many drinks she had consumed. *Id.* At 1:32 a.m., various other law enforcement personnel arrived; 20 minutes later, emergency responders placed the defendant in a waiting ambulance, which departed the scene for the hospital at 2:37 a.m., arriving 10 minutes later. *Id.* at 366–67. Hospital staff completed their treatment of defendant at 3:00 a.m., at which point the officer was allowed to question the defendant. *Id.* at 367. The officer noticed that the defendant had a strong odor of alcohol and bloodshot eyes, was slurring her speech, and appeared confused and unable to exhibit proper balance. *Id.* at 367–68. The officer eventually convinced a

37

physician to withdraw a specimen of blood at 4:50 a.m., which revealed a blood alcohol concentration of 0.15. *Id.* at 368.

Before trial, the defendant moved to suppress the results of the test, arguing that she was apprehended when she was placed in the ambulance and that the results, therefore, fell outside of CJP § 10-303(a)(2)'s two-hour window. *Id.* at 369. The circuit court denied her motion, ruling that the defendant was not "apprehended" under that statute until 3:00 a.m., such that the test was performed within the two-hour window. *Id.*

On appeal, we affirmed the circuit court. *Id.* at 380. As a preliminary matter, relying on our opinion in *State v. Loscomb*, 291 Md. 424 (1981), we held that the General Assembly "intended for an apprehension [under CJP § 10-303(a)(2)] to be the functional equivalent of a stop or detention." *Id.* at 376. From there, we derived the two-part test that an individual is apprehended under CJP § 10-303(a)(2) when law enforcement has reasonable grounds to believe that the individual is or has been operating a motor vehicle while under the influence of drugs or alcohol and then acts on such information by stopping or detaining the person. *Id.*

In fashioning that test, we noted that, in most cases, ascertaining the moment of apprehension will not be difficult: trained officers will be able to observe the "typical indicia of drunk driving, such as speeding, weaving, disobeying traffic signals, and other erratic or unusual maneuvers." *Id.* at 377. In those instances, an officer stopping an individual based on those indicia will have apprehended an individual under CJP § 10-303(a)(2). But situations that include personal injury "inject an element of complexity into an otherwise simple determination of when an accused is apprehended." *Id.* at 378. Where

38

personal injury is present, law enforcement encounters the "thorny dilemma" of trying to gather evidence from a drunk driving suspect who might otherwise also need immediate medical attention. *Id.* Our two-part test, thus, balanced these competing interests:

> [C]ommon sense dictates that[,] upon arriving at an accident scene[,] the officer's paramount responsibility is to render any necessary emergency medical treatment until trained personnel arrive. Until such a time[,] it would be eminently unreasonable for the officer to engage in a comprehensive accident investigation. In short, the police officer's investigatory responsibilities are subordinated to the more pressing responsibility of rendering emergency medical treatment and to take other steps to secure the safety of both the victims and the public, such as directing traffic at the accident scene. Once the appropriate personnel arrive, the officer is[,] in most cases[,] relieved of his emergency medical treatment responsibility and is[,] thus[,] free to engage in an investigation if it does not interfere with the treatment of the injured or jeopardize the safety or welfare of those involved. Hence, police must usually wait until the emergency subsides and until the necessary medical treatment has been rendered before pursuing their criminal investigation.

*Id.* at 378–79.

In *Willis*, although law enforcement (1) smelled alcohol on the defendant, who acted confused and disoriented at the scene and admitted to consuming alcohol, (2) confiscated her license, and (3) placed her in the back of an ambulance, we nevertheless held that the defendant was not apprehended until much later when law enforcement began its questioning at the hospital and noticed traditional indicia of intoxication that the defendant presented. *Id.* at 366–67, 379–80. It was then that the responding officer "had the first opportunity of any police officer involved in [that] investigation to act upon this information and to apprehend [the defendant]." *Id.* at 380. There, the officer "acted reasonably by waiting until all necessary emergency medical treatment had been rendered at the hospital[]"

39

before initiating the apprehension. *Id.* Thus, the breath test in that case was timely under CJP § 10-303(a)(2). *Id.*

Mr. Singh's case begins and ends with *Willis*. Just as in *Willis*, where the officer did not have reasonable suspicion to believe that the defendant operated a vehicle under the influence of alcohol and, in turn, acted on that suspicion several hours after law enforcement came into contact with the defendant, Mr. Singh similarly was not apprehended under the statute until Officer Curry came into contact with him at 8:51 a.m. and subsequently initiated the SFSTs. *See id.* at 379–80. Throughout the record, several law enforcement personnel stressed that Mr. Singh's behavior was odd, but no one definitively stated that they believed Mr. Singh to be under the influence of alcohol. For example, Officer Smorse stated that "it didn't necessarily appear that [Mr. Singh] was intoxicated, but he seemed off and that he [did not] seem like he was sober." In fact, Officer Smorse chose not to conduct SFSTs due to the lack of clear signs that Mr. Singh was intoxicated. Specifically, Officer Smorse recalled how Mr. Singh's eyes did not appear bloodshot, and that he would have expected such indicia from someone who was intoxicated. Indeed, Officer Smorse had even *less* reasonable grounds to believe that Mr. Singh was under the influence of alcohol than the responding officer in *Willis*. In contrast to the case before us, where the officers who initially interacted with Mr. Singh struggled to identify clear signs of intoxication, the responding officer in *Willis* noticed the smell of alcohol on the defendant almost immediately upon interaction, and the defendant herself informed law enforcement that she had previously consumed alcohol. *See* 302 Md. at 379–80.

The record discloses that the officers who initially responded to the incident did not have a reasonable suspicion that Mr. Singh operated a vehicle under the influence of alcohol, something that did not arise until Officer Curry's initial interaction with Mr. Singh at 8:51 a.m. At that moment, Officer Curry observed clear signs that Mr. Singh was under the influence of alcohol, providing reasonable suspicion that he had operated his vehicle under that influence when he struck the Ortizes, and Officer Curry further acted on that suspicion when she initiated SFSTs. As indicated above for the first issue, law enforcement did not place Mr. Singh in the cruiser because they had reasonable suspicion that he was driving under the influence of alcohol. Instead, Mr. Singh was placed in Officer Vanderford's cruiser for a variety of legitimate reasons: to protect Mr. Singh from having to witness life-saving medical aid, to permit law enforcement to conduct an unobstructed investigation, and because Mr. Singh constituted a flight risk.

To be sure, law enforcement certainly had reasonable suspicion—generally—to detain Mr. Singh, and the parties do not dispute otherwise. At the time Officer Smorse informed Mr. Singh that he was not free to leave, there was certainly reasonable suspicion that he had committed *some crime*, possibly multiple crimes. But while law enforcement may have had a *hunch* that Mr. Singh was under the influence of alcohol, such hunches fall well below the standard for reasonable suspicion. *See, e.g.*, *Crosby v. State*, 408 Md. 490, 507 (2009) ("[R]easonable suspicion . . . embraces something more than an 'inchoate and unparticularized suspicion or 'hunch.'" (quoting *Terry*, 392 U.S. at 27)).[22]

_____

[22] We note that the test we described in *Willis* proceeds in what we will call the ordinary course of events. That is, the test assumes that an officer will observe traditional

41

Mr. Singh further devotes attention in his brief to the fact that, in *Willis*, we previously read CJP § 10-303(a)(2) in *pari materia* with § 16-205.1 of the Transportation Article ("TR"). In that vein, Mr. Singh highlights that CJP § 10-303(a)(2) and TR § 16-205.1 now also apply to tests carried out for the detection of impairment via illegal drugs when, at the time of *Willis*, those statutes applied only to the influence of alcohol. Mr. Singh appears to place emphasis on these statutory developments because he argues that, by the time he was placed into Officer Vanderford's cruiser at 7:43 a.m., "police had reasonable suspicion to believe that he had been driving under the influence of alcohol *and/or drugs*[.]" (Emphasis added).

Mr. Singh explicitly petitioned this Court to "reconsider" *Willis* "[i]n light of" those statutory revisions and determine whether our test in *Willis* applies to suspected operation of a motor vehicle under the influence of drugs. We did not grant certiorari review on that question. As the State correctly noted in its answer to Mr. Singh's petition, this case "d[oes] not involve drug intoxication or drug testing." We will not opine on an issue that we

---

indicia of operating a vehicle under the influence of alcohol, and then stop or detain the driver based on that reasonable suspicion. In those cases, CJP § 10-303(a)(2)'s clock starts at the precise moment of the stop. Here, however, Mr. Singh was properly detained when Officer Smorse informed Mr. Singh that he was not free to leave based on reasonable suspicion that he had committed *some crime, generally*. But, as we have discussed, law enforcement still lacked at that moment reasonable suspicion that he had *specifically* operated his motor vehicle under the influence of alcohol. That more specified reasonable suspicion arose when Officer Curry opened the door to Officer Vanderford's cruiser, smelled alcohol on Mr. Singh's person, and subsequently instructed him to exit the vehicle to perform SFSTs. We note that, under *Willis*, it is enough that law enforcement *act on* its reasonable suspicion that an individual has operated a vehicle under the influence of alcohol. That action need not be cabined to a stop or detention because, as this case illustrates, a detention can, in some situations, precede the reasonable suspicion that an individual has operated a vehicle under the influence of alcohol in the first place.

42

explicitly declined to accept at the certiorari stage. In any event, Mr. Singh's argument does not aid him because it presupposes a bifurcated world where officers could conclude that Mr. Singh was either under the influence of drugs or alcohol—without any other explanation for his behavior. Such an argument fails to account for the myriad other reasons that law enforcement thought might explain Mr. Singh's behavior: adverse reactions to medication, mental health issues, shock from just having been in an accident, etc.

Thus, although Mr. Singh was placed in Officer Vanderford's cruiser at 7:43 a.m., he was not apprehended under CJP § 10-303(a)(2) until 8:51 a.m., and his breath test conducted at 10:15 a.m. was timely under that statute. *See Willis*, 302 Md. at 379–80.

## V
## CONCLUSION

We hold that, under the totality of the circumstances, Mr. Singh's investigatory detention was reasonable. When balancing the nature of the intrusion into Mr. Singh's personal security against the State's interest in conducting an unobstructed investigation, preventing Mr. Singh from having to witness first responders rendering aid to the two individuals he had just struck with his vehicle, and preventing Mr. Singh from leaving the scene, the record demonstrates that law enforcement acted reasonably when they placed Mr. Singh in the back of Officer Vanderford's vehicle while they conducted a swiftly developing investigation.

We further hold that none of the officers had reasonable suspicion to believe that Mr. Singh operated his vehicle under the influence of alcohol until, at earliest, 8:51 a.m., when Officer Curry opened the door to Officer Vanderford's cruiser and immediately

43

smelled the odor of alcohol on Mr. Singh. It was only at that point that Officer Curry had reasonable suspicion to believe that Mr. Singh operated his vehicle under the influence of alcohol and subsequently acted on that reasonable suspicion by requesting Mr. Singh to step out of the vehicle to perform SFSTs. Because Mr. Singh's breath test occurred at 10:15 a.m., well within the two-hour window provided by CJP § 10-303(a)(2), the State did not violate that statute.

Accordingly, we affirm the judgment of the Appellate Court and affirm Mr. Singh's convictions.

**JUDGMENT OF THE APPELLATE COURT OF MARYLAND AFFIRMED. PETITIONER TO PAY COSTS IN THIS COURT.**